**CALLAHAN & BLAINE, APLC**
Daniel J. Callahan (Bar No. 91490)
    dcallahan@callahan-law.com
Edward Susolik (Bar No. 151081)
    esusolik@callahan-law.com
Richard T. Collins (Bar No. 166577)
    rcollins@callahan-law.com
Damon D. Eisenbrey (Bar No. 215927)
    deisenbrey@callahan-law.com
Adrian L. Canzoneri (Bar No. 265168)
    acanzoneri@callahan-law.com
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444
Facsimile:  (714) 241-4445

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

In re: Out of Network Substance Use Disorder Claims Against UnitedHealthcare

**Case No.: 8:19-cv-02075-JVS-DFMx**

*Assigned to Judge James V. Selna*

Consolidated with:
| | |
|---|---|
| 8:19-cv-02082 | 8:19-cv-02083 |
| 8:19-cv-02084 | 8:19-cv-02085 |
| 8:19-cv-02086 | 8:19-cv-02087 |
| 8:19-cv-02088 | 8:19-cv-02372 |
| 8:20-cv-00136 | 8:20-cv-00137 |
| 8:20-cv-00138 | 8:20-cv-00340 |
| 8:20-cv-00341 | 8:20-cv-00356 |

**THIRD AMENDED CONSOLIDATED COMPLAINT FOR:**

1. **CLAIMS FOR PLAN BENEFITS UNDER ERISA, 29 U.S.C. §1132(a)(1)(B)**
2. **BREACH OF WRITTEN CONTRACT**
3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
4. **BREACH OF IMPLIED CONTRACT**
5. **BREACH OF ORAL CONTRACT**
6. **PROMISSORY ESTOPPEL**
7. **UNFAIR COMPETITION**

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**DEMAND FOR JURY TRIAL**

This Document relates to:
**"ALL ACTIONS"**

Plaintiffs DR Recovery Encinitas, LLC, MMR Services, LLC, TML Recovery, LLC, Woman's Recovery Center, LLC, Kool Living, Inc., Pacific Palms Recovery, LLC, Inland Detox, Inc., Southern California Addiction Center, Inc., Addiction Health Alliance, LLC, Creative Care, Inc., JMG Investments, Inc., Valley Restoration Center, Inc., Southern California Recovery Centers Oceanside, LLC, JD Recovery, LLC, and 12 South, LLC (collectively "Plaintiffs")[1] hereby allege against Defendants UnitedHealth Group, Inc., United HealthCare Services, Inc., United HealthCare Insurance Company, UHC of California, United HealthCare Services LLC, United Behavioral Health, Inc., United Medical Resources, Inc., OptumInsight, Inc., Optum Services, Inc., Optum, Inc., Viant Inc., MultiPlan, Inc. (collectively "Defendants") as follows:

---

[1]  The following nine cases are in Band 1 (Active): *DR Recovery Encinitas, LLC v. UnitedHealth Group, Inc., et al.*, Case No. 8-19-cv-02075; *MMR Services, LLC .v UnitedHealth Group, Inc., et al.*, Case No. 8-19-cv-02082; *TML Recovery, LLC v UnitedHealth Group, Inc, et al.*, Case No. 8-19-cv-02083; *Woman's Recovery Center, LLC v. UnitedHealth Group, Inc., et al.*, Case No. 8-19-cv-02084; *Kool Living, Inc. v. UnitedHealth Group, Inc., et al.*, Case No. 8:19-cv-02085; *Pacific Palms Recovery, LLC v. UnitedHealth Group, Inc., et al.*, Case No. 8-19-cv-02086; *Inland Detox, Inc. v. UnitedHealth Group, Inc., et al.*, Case No. 8-19-cv-02087; *Southern California Addiction Center, Inc. v. UnitedHealth Group, Inc., et al.*, Case No. 8-19-cv-02088; and *Addiction Health Alliance, LLC v. UnitedHealth Group, Inc., et al.*, Case No. 8:19-cv-02372.

The following six cases are in Band 2 (Stayed): *Creative Care, Inc. v. UnitedHealth Group, Inc., et al.*, Case No. 8:20-cv-00136; *JMG Investments, Inc. v. UnitedHealth Group Inc., et al.*, Case No. 8:20-cv-00137; *Valley Restoration Center, Inc. v. UnitedHealth Group Inc., et al.*, Case No. 8:20-cv-00138; *Southern California Recovery Centers Oceanside, LLC v. UnitedHealth Group Inc., et al.*, Case No. 8:20-cv-00340; *JD Recovery, LLC v. UnitedHealth Group Inc., et al.*, Case No. 8:20-cv-00341; and *12 South, LLC v. UnitedHealth Group Inc., et al.*, Case No. 8:20-cv-00356.

- 1 -

**THIRD AMENDED CONSOLIDATED COMPLAINT**

## THE PARTIES

1.      Plaintiff DR Recovery, LLC ("DR Recovery") (TIN 47-1361036) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  DR Recovery is a substance use disorder treatment provider and clinical laboratory.  DR Recovery is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  DR Recovery is, and at all relevant times herein was, certified by the California Department of Health Care Services ("DHCS") to operate a substance use disorder treatment program.  DR Recovery has, and at all relevant times herein had, a Centers for Medicare and Medicaid Services ("CMS"), Clinical Laboratory Improvements Amendments ("CLIA"), certificate of waiver, and at times relevant herein, was licensed by the California Department of Public Health ("DPH") and accredited by the CMS and Commission on Office Laboratory Accreditation ("COLA") for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.

2.      Plaintiff MMR Services, LLC ("MMR Services") (TIN 47-3018602) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  MMR Services is a clinical laboratory.  MMR Services provides laboratory services to those in the process of recovering from mental health and substance use disorders.  MMR Services is, and at all relevant times herein was, licensed by the DPH and accredited by the CMS and COLA for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.

THIRD AMENDED CONSOLIDATED COMPLAINT

1    MMR Services is a full service, CLIA compliant, high complexity reference

2    specialty laboratory that combines state of the art laboratory testing processes,

3    methodologies and cutting-edge technology for its specialization in urine toxicology

4    drug confirmation testing which is designed to provide accurate results that help

5    physicians and clinicians create a scientifically designed drug monitoring strategy

6    for optimal treatment outcomes, which includes core lab and PGx testing for

7    accurate prescription therapy.

8        3.      Plaintiff TML Recovery, LLC ("TML Recovery") (TIN 46-2916076)

9    is, and at all relevant times herein mentioned was, a California limited liability

10   company qualified to do business in the State of California.  TML Recovery is a

11   substance use disorder treatment provider and clinical laboratory.  TML Recovery is

12   in the profession of helping individuals recover from alcoholism and addiction and

13   return to their families and communities as productive and contributing members of

14   society.  TML Recovery is, and at all relevant times herein was, certified by the

15   DHCS to operate a substance use disorder treatment program.  TML Recovery is,

16   and at all relevant times herein was, accredited by The Joint Commission,

17   Behavioral Health Care Accreditation Program ("JCAHO"), and The Commission

18   on Accreditation of Rehabilitation Facilities International ("CARF"), and has a

19   CMS, CLIA, certificate of waiver.  At times relevant herein, TML Recovery was

20   licensed by the DPH and accredited by the CMS and COLA for the examination of

21   materials derived from the human body for the purpose of providing information for

22   the diagnosis, prevention, and treatment of human disease or impairment, and to

23   determine, measure, or otherwise describe the presence or absence of various

24   substances or organisms in the body.

25       4.      Plaintiff Woman's Recovery Center, LLC ("Woman's Recovery")

26   (TIN 81-5361991) is, and at all relevant times herein mentioned was, a California

27   limited liability company qualified to do business in the State of California.

28   Woman's Recovery is a substance use disorder treatment provider.  Woman's

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Recovery is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Woman's Recovery is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program and holds a CMS, CLIA, certificate of waiver.

5.      Plaintiff Kool Living, Inc. ("Kool Living") (TIN 46-1249745) is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California.  At all times relevant herein, Kool Living was a substance use disorder treatment provider in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Kool Living was, at all relevant times herein, licensed and certified by the DHCS to operate a substance use disorder residential facility and treatment program, accredited by JCAHO, and holder of a CMS, CLIA, certificate of waiver.

6.      Plaintiff Pacific Palms Recovery, LLC ("Pacific Palms") (TIN 80-0651115) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  Pacific Palms is a substance use disorder treatment provider.  Pacific Palms is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Pacific Palms is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program.  Pacific Palms is, and at all relevant times herein was, accredited by JCAHO and CARF, and has a CMS, CLIA, certificate of waiver.

7.      Plaintiff Inland Detox, Inc. ("Inland Detox") (TIN 47-4597782) is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California.  Inland Detox is a substance use disorder treatment provider.  Inland Detox is in the profession of helping individuals recover

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

from alcoholism and addiction and return to their families and communities as productive and contributing members of society. Inland Detox is, and at all relevant times herein was, licensed and certified by the DHCS to operate a substance use disorder residential facility and treatment program. Inland Detox is, and at all relevant times herein was, accredited by CARF, and holds, at all relevant times herein held, a CMS, CLIA, certificate of waiver.

8. Plaintiff Southern California Addiction Center, Inc. ("SCAC") (TIN 47-5231947) is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California. At all times relevant herein, SCAC was a substance use disorder treatment provider in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. SCAC was, at all relevant times herein, licensed and certified by the DHCS to operate a substance use disorder residential facility and treatment program, accredited by JCAHO, and holder of a CMS, CLIA, certificate of waiver.

9. Plaintiff Addiction Health Alliance, LLC ("AHA") (TIN 46-5515765) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California. AHA is a substance use disorder treatment provider and clinical laboratory. AHA is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. AHA is, and at all relevant times herein was, licensed by the DHCS to operate a substance use disorder residential facility and accredited by JCAHO. AHA is also licensed by the DPH and accredited by the CMS and COLA for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.

10. Plaintiff Creative Care, Inc. ("Creative Care") (TIN 95-4222328) is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California. Creative Care is a substance use disorder treatment provider. Creative Care is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. Creative was, at all relevant times herein, licensed and certified by the DHCS to operate a substance use disorder residential facility and treatment program and accredited by CARF.

11. Plaintiff JMG Investments, Inc. ("JMG") (TIN 38-3941572) is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California. JMG is a substance use disorder treatment provider. JMG is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. JMG is, and at all relevant times herein was, licensed and certified by the DHCS to operate a substance use disorder residential facility and treatment program. JMG is, and at all relevant times herein was, accredited by JCAHO and CARF, and has a CMS, CLIA, certificate of waiver.

12. Plaintiff Valley Restoration Center, Inc. ("Valley Restoration") (TIN 47-5188505) is, and at all relevant times herein mentioned was, a California corporation qualified to do business in the State of California. Valley Restoration is a substance use disorder treatment provider. Valley Restoration is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society. Valley Restoration is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program. Valley Restoration is, and at all relevant times herein was, accredited by JCAHO, and has a CMS, CLIA, certificate of waiver.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

13.     Plaintiff Southern California Recovery Centers Oceanside, LLC ("SCRCO") (TIN 47-4573182) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  SCRCO is a substance use disorder treatment provider and clinical laboratory.  SCRCO is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  SCRCO is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program. At all times relevant herein, SCRCO has had a CMS, CLIA, certificate of waiver, and at times relevant herein, was licensed by the DPH and accredited by the CMS and COLA, for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.

14.     Plaintiff JD Recovery, LLC ("JD Recovery") (TIN 81-1098016) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  JD Recovery is a clinical laboratory, licensed by the DPH and accredited by the CMS and COLA for the examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, and treatment of human disease or impairment, and to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body.  JD Recovery is a full service, CLIA compliant, high complexity reference specialty laboratory that combines state of the art laboratory testing processes, methodologies and cutting-edge technology for its specialization in urine toxicology drug confirmation testing which is designed to provide accurate results that help physicians and clinicians create a scientifically designed drug monitoring strategy for optimal treatment outcomes, which includes core lab and PGx testing for accurate prescription

THIRD AMENDED CONSOLIDATED COMPLAINT

therapy.

15.     Plaintiff 12 South, LLC ("12 South") (TIN 47-5125464) is, and at all relevant times herein mentioned was, a California limited liability company qualified to do business in the State of California.  12 South is a mental health and substance use disorder treatment provider.  12 South is in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  12 South is, and at all relevant times herein was, certified by the DHCS to operate a substance use disorder treatment program and accredited by JCAHO, and has a CMS, CLIA, certificate of waiver.

16.     On information and belief, Defendant UnitedHealth Group Inc. ("UHG") is a Delaware corporation which conducts insurance operations throughout California.  UHG issues health insurance and issues, manages, administers, and makes coverage and benefit determinations, and develops and applies guidelines in making benefit determinations related to health care plans nationally through its various wholly-owned and/or controlled subsidiaries, controlled agents and/or undisclosed principals, including, but not limited to, Defendants United HealthCare Services, Inc., United HealthCare Insurance Company, UNC of California, United HealthCare Services LLC, United Behavioral Health, Inc., United Medical Resources, Inc., OptumInsight, Inc., Optum Services, Inc., Optum, Inc., Viant Inc., and MultiPlan, Inc.  Plaintiffs are informed and believe, and based thereon allege, that UHG is licensed and/or regulated by the California Department of Insurance ("CDI") and/or the California Department of Managed Health Care ("CDMHC") to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.  Plaintiffs are informed and believe, and based thereon allege, that UHG operates as and owns the trademark "UnitedHealthcare."

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

17.  On information and belief, Defendant United HealthCare Services, Inc. ("UHS") is a Minnesota corporation which conducts insurance operations throughout California.  UHS provides health benefit programs for individuals and families, employers, military service personnel, retirees and their families, and serves as the operating division of UHG and its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon allege, that UHS is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

18.  On information and belief, Defendant United Healthcare Insurance Company ("UHI") is a Connecticut corporation which conducts insurance operations throughout California.  UHI underwrites many of the UnitedHealthcare individual and family insurance products and participates in the claims administration process related to plans insured, managed and/or administered by UHG and its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon allege, that UHG is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

19.  On information and belief, Defendant UHC of California d/b/a United Health Care of California ("UHCC") is a California corporation located in Cypress, California.  UHCC conducts administration process and coverage determinations on health plans insured, managed and/or administered by UHG and its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon allege, that UHCC is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the

State of California.

20. On information and belief, Defendant UnitedHealthcare Service LLC ("UHSLLC") is a Delaware limited liability company with its principal office in Cypress, California. UHSLLC provides administrative, financial and managerial services to UHG and its subsidiaries and affiliates. Plaintiffs are informed and believe, and based thereon allege, that UHSLLC is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

21. On information and belief, Defendant United Behavioral Health, Inc. ("UBH") is a California corporation with its principal place in San Francisco, California. UBH provides and/or manages mental health and substance use disorder benefits for insureds/members of UHG and its subsidiaries and affiliates, and is responsible for making benefit coverage determinations for mental health and substance use disorder services that are provided to said insureds/members. UBH sometimes operates as OptumHealth Behavioral Solutions and under the brand name Optum U.S. Behavioral Health, California, doing business as OptumHealth Behavioral Solutions of California. Plaintiffs are informed and believe, and based thereon allege, that UBH is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

22. On information and belief, Defendant United Medical Resources, Inc. ("UMR") is a California corporation which conducts insurance operations throughout California. UMR provides, administers and/or manages claim processing and administration services for UHG and its affiliates, including mental health and substance use disorder treatment and clinical laboratory benefit claims, is responsible for making benefit coverage determinations for mental health and

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

substance use disorder treatment and laboratory services that are provided to UHG's insureds/members, provides UHG and its affiliates with claim recovery management, claim repricing and provider data management software and services and non-network claims cost containment services, and provides UHG and its affiliates with a network of health care providers, including mental health and substance use disorder treatment providers and clinical laboratories. Plaintiffs are informed and believe, and based thereon allege, that UMR is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

23.     On information and belief, Defendant OptumInsight, Inc. ("OII") is a Delaware corporation which conducts insurance operations throughout California. OII, formerly known as Ingenix,[2] provides health care data management for UBH and its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon allege, that OII is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting

---

[2]  On January 13, 2009, New York Attorney General Andrew M. Cuomo announced historic reform of the nationwide health care reimbursement system that was to end conflicts of interest and generate fair reimbursement rates for working families nationwide.  The Attorney General reached an agreement with UnitedHealth Group Inc., the nation's second largest health insurer, after conducting an industry-wide investigation into a scheme to defraud consumers by manipulating reimbursement rates.  At the center of the scheme was Ingenix, Inc., a wholly-owned subsidiary of UnitedHealthcare.  *See* Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars - Industry-Wide Reform of Reimbursement System Will End Conflicts of Interest and Create Fair Rates for Consumers Nationwide - Press Release (January 13, 2009), retrieve on February 26, 2020 from https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-health-insurance-reform-ends; *see also*, The Medical Society of the State of New York, United Healthcare/Ingenix Settlement, retrieve on February 26, 2020 from https://www.mssny.org/MSSNY/Resources/Legal_Matters/Class_Action_Settlements/United_Healthcare_Settlement/MSSNY/Practice_Resources/Legal_Matters/Class_Action_Settlements/United_Healthcare_Settlement.aspx?hkey=52f280ad-c706-4fe9-92cd-26fb332d9860.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

24.     On information and belief, Defendant Optum Services, Inc. ("Optum") is a Delaware corporation which conducts insurance operations throughout California.  Optum is a health services business serving the health care marketplace, including payers and health care providers, and provides shared claims handling and processing services for UHG and its subsidiaries and affiliates.  Optum sometimes operates as Optum and Optum Shared Solutions.  Plaintiffs are informed and believe, and based thereon allege, that Optum is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

25.     On information and belief, Defendant Optum, Inc. ("OI") is a Delaware corporation which conducts insurance operations throughout California.  OI is a health services business serving the health care marketplace, including payers and UHG and its subsidiaries and affiliates, through its OptumHealth, OptumInsight and OptumRx businesses.  Plaintiffs are informed and believe, and based thereon allege, that OI is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

26.     On information and belief, Defendant Viant Inc. ("Viant") is a Nevada corporation which conducts insurance operations throughout California.  Viant provides health care payment solutions and offers auditing and reimbursement of behavioral health and substance use disorder claims and costs, as well as prepayment services such as treatment facility bill review and professional negotiation, on plans insured, managed and/or administered by UHG and its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 12 -

allege, that Viant is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

27.     On information and belief, Defendant MultiPlan, Inc. ("MPI") is a New York corporation which conducts insurance operations throughout California.  MPI is a provider of healthcare cost management solutions, specializing in providing claim cost management solutions for controlling the financial risks associated with health care bills on plans insured, managed and/or administered by UHG and its subsidiaries and affiliates.  MPI also offers preferred provider organization network solutions for accessing hospitals, ancillary care facilities, treatment facilities, and health care professionals for the benefit and at the control and direction of UHG and its subsidiaries and affiliates.  Plaintiffs are informed and believe, and based thereon allege, that MPI is licensed and/or regulated by the CDI and/or the CDMHC to transact the business of insurance in the State of California, is in fact transacting the business of insurance in the State of California, and is thereby subject to the laws and regulations of the State of California.

28.     Plaintiffs are informed and believe that, at all relevant times, each of the Defendants was and is the agent, servant, representative, undisclosed principal and/or alter ego of each of the other Defendants, and in doing the things herein alleged, each of the Defendants was acting in the scope of its authority as such agent, servant, representative, undisclosed principal and/or alter ego, and with the permission and consent of each of the other Defendants.

29.     Plaintiffs are informed and believe that, at all relevant times, Defendants are the alter egos of the other Defendants, have comingled assets, have comingled business operations, have undercapitalized operations, have ignored corporate formalities, and have exercised such dominion and control over the operations of the other Defendants that it would be unjust to permit such Defendants

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 13 -

to avoid individual liability.  Plaintiffs are further informed and believe, that a unity of interest and ownership exists between Defendants, that any individuality and separateness between Defendants have ceased, and that Defendants are the alter egos of one another.  On information and belief, Plaintiffs understand and believe that Defendants share the same common ownership, places of business, managements, and operate as a single enterprise.

30.     Plaintiffs are informed and believe that, at all relevant times, each of the Defendants formed and operated a conspiracy with each of the other Defendants to perform the acts alleged herein, in furtherance of a common design to place profits over patients and damage substance use disorder treatment providers, including Plaintiffs, and with knowledge that the conduct alleged herein of each of the Defendants constituted violations of law and provided substantial assistance or encouragement to each other to so act against insured patients and substance use disorder treatment providers, including Plaintiffs.

## **BRIEF STATEMENT OF THE CONSOLIDATED LITIGATION**

31.     Plaintiffs are out-of-network substance use disorder treatment providers and clinical laboratories.  Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Plaintiffs provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 1,304 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Plaintiffs include residential detoxification and residential treatment ("RTC"), partial hospitalization/day treatment ("PHP"), intensive outpatient ("IOP"), outpatient ("OP"), treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.  The

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    treatments and services were provided by or under the direction of properly

2    qualified behavioral health providers and/or medical and clinical professionals.

3         32.    Defendants' health insurance plans, for each of the 1,304 insureds at

4    issue, provide coverage for out-of-network substance use disorder treatment and

5    laboratory services.  In this regard, the plans, and each of them, provide that out-of-

6    network substance use disorder benefits include the following levels of care: RTC,

7    PHP, IOP, and OP.  The plans also provide that out-of-network covered substance

8    use disorder services include: diagnostic evaluations, assessment and treatment

9    planning, treatment and/or procedures, medication management and other associated

10   treatment, psychological testing, referral services, individual, family and group

11   therapy, provider-based case management services, and crisis intervention.  The

12   plans further provide coverage for out-of-network laboratory benefits, which include

13   the facility charge and the charge for supplies and equipment, physician services for

14   pathologists, and presumptive drug tests and definitive drug tests.

15        33.    Defendants' health insurance plans, for each of the 1,304 insureds at

16   issue, pay benefits for out-of-network substance use disorder treatment and

17   laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic

18   evaluations, assessment and treatment planning, treatment and/or procedures,

19   medication management and other associated treatment, psychological testing,

20   referral services, individual, family and group therapy, provider-based case

21   management services, crisis intervention, and laboratory services, at varying

22   percentages of covered charges (between 50% to 90% of covered charges, with the

23   majority of plans paying out-of-network benefits at 70% of covered charges (minus

24   any outstanding insured cost-sharing amounts, which Defendants deduct from

25   payments to Plaintiffs)) until the insured's nominal annual out-of-pocket maximum

26   is met at which time Defendants pay 100%.  Plaintiffs are informed and believe, and

27   based thereon allege, that each of the 1,304 insureds had already met their annual

28   out-of-pocket maximum at the time they first received treatment or services from

- 15 -

Plaintiffs, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.  The exclusions, conditions and limitations in the plans do not apply to the treatments and services provided by Plaintiffs.

34.     Each of Defendants' insureds orally assigned benefits and payments by their insurance company or health plan to Plaintiffs and Plaintiffs obtained written assignments of benefits from each of the insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.

35.     In reliance on the assignments of benefits, Plaintiffs, and each of them, rendered the subject treatment and services to Defendants' insureds/members. Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants, the premiums were paid and the plans were effective, and that Plaintiffs would be paid for treating Defendants' insureds.  In reliance on Defendants' coverage representations and payment promises, Plaintiffs, and each of them, rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Plaintiffs were treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, advised and fully aware of Plaintiffs' charges for the treatment and services rendered, at each level of care.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

36.     After providing covered treatment and services to the 1,304 insureds at issue, Plaintiffs submitted their claims to Defendants for payment, with the claim forms notifying Defendants that Plaintiffs were submitting the claims as the insureds' assignee.  Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met, at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to Plaintiffs during the verification and benefits and preauthorization process for each of the 1,304 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment and laboratory services, is a percentage of their covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met, at which time Defendants pay 100%.

37.     Instead of paying Plaintiffs per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Plaintiffs, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of 19.15% of their covered charges.  It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for the covered treatment and services rendered to Defendants' insureds.

38.     During the claim submission and payment process, Defendants put Plaintiffs on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and

- 17 -

information from Plaintiffs, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Plaintiffs complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Plaintiffs for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Plaintiffs (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

39.     Defendants never informed or advised Plaintiffs during the claim submission and payment process or post-claims process, and never denied Plaintiffs payment on the grounds of any anti-assignment provisions in the health plans at issue.  As a result and by operation of law and principles of equity, Defendants have waived and are estopped from asserting any such anti-assignment provisions in any

of the health plans at issue in this action.[3]

40.     As a result, Plaintiffs have suffered and continue to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Plaintiffs, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, and moreover, Plaintiffs are entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.[4]

## AMERICA'S SUBSTANCE USE DISORDER EPIDEMIC

41.     Now, as never before, there is a critical need for access to treatment for substance use disorders.  The Substance Abuse and Mental Health Services Administration (SAMHSA) estimates that in 2014, 20.2 million adult Americans, or

[3] *See, California Spine and Neurosurgery Institute v. Blue Cross of California*, 2020 WL 3536496 at *1 (9th Cir. June 30, 2020) ("district court erred in determining waiver was inapplicable[;]" and "district court also erred in concluding that [Plaintiff] failed to satisfy three equitable estoppel factors" when insurer asserted for the first time in litigation an anti-assignment provision to avoid coverage.); *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014) (considering an anti-assignment provision and explaining that "an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court."); *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012) ("ERISA and its implementing regulations are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.").

[4]     The treatment and claim documents concerning each of the subject 1,304 patient insureds treated by Plaintiffs contain personal health and treatment information protected by law from public disclosure pursuant to, *inter alia*, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  Protective Orders have been entered in the nine Band 1 cases, which include: DR Recovery, MMR Services, TML Recovery, Woman's Recovery, Kool Living, Pacific Palms, Inland Detox, SCAC, and AHA.  On January 6, 2020, the Band 1 Plaintiffs produced their claims reports to Defendants.  The reports set forth the subject patient's initials and member identification number, the service start and end dates, the amounts billed and paid, and the outstanding balance. With Plaintiffs' company names and TINs, Defendants can access a trove of information on each of Plaintiffs' patients, including, but not limited to, the patient's name, date of birth, residence address, gender, family relationships, name and type of insurance plan/policy and state of issuance, dates of coverage, dates of service, types and levels of care provided, claim numbers, billed amounts, explanations of benefits paid or denied, and appeals and grievances regarding claims denied.  The information available to Defendants through Plaintiffs' company names and TINs is sufficient enough to apprise Defendants of the substance of Plaintiffs' claims.  The Band 2 cases are currently stayed.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

8.4 percent of the adult population suffered from a substance use disorder within the past year.[5]  According to the President's Commission on Combatting Drug Addiction and the Opioid Crisis (November 2017), heroin overdose deaths increased four-fold from 2010 to 2015, while overdose deaths due to prescription opioids consistently outpaced even the disturbingly high heroin overdose rates.[6]  Drug overdoses now cause more deaths than either car accidents or guns, and those suffering from substance use disorders are at the highest risk.

42.     On average, 130 Americans die every day from an opioid overdose. The opioid crisis has and continues to destroy lives and devastate families and communities.[7]  It is the deadliest drug crisis in United States history and it is only getting worse.[8]  In 2017 alone, California lost 2,196 lives to the opioid epidemic. Timely access to life-sustaining and life-saving treatment and continuing care for substance use and mental health disorders is critical to preventing these deaths and allowing people to achieve long-term recovery and to return to their families, friends

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

---

[5] *See* Rachel N. Lipari & Struther L. Van Horn, Trends in Substance Use Disorders in Adults 18 and Older (June 29, 2017), retrieved on May 23, 2019 from https://www.samhsa.gov/data/sites/default/files/report_2790/ShortReport-2790.html.

[6] *See* President's Commission on Combatting Drug Addiction and the Opioid Crisis, Final Report, at p. 32, retrieved on May 23, 2019 from https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.

[7] *See* Centers for Disease Control and Prevention, Understanding the Epidemic, retrieved on May 28, 2019 from https://www.cdc.gov/drugoverdose/epidemic/index.html.

[8] *See* California Department of Public Health, Patterns of Opioid-Related Overdose Deaths in California, 2011-2017 (March 2019), retrieved on June 12, 2019 from https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Prescription%20Drug%20Overdose%20Program/Injury%20Data%20Brief%20Opioid%20Overdose%20Deaths%202011-2017_ADA.pdf.

and communities as healthy, productive and contributing members of society.[9]

43.    Addiction is recognized as a chronic, relapsing brain disorder characterized by compulsive drug seeking, continued use despite harmful consequences, and long-lasting changes in the brain.  Addiction is considered both a complex brain disorder and a mental illness.  The brain changes can be long lasting and can lead to many harmful, often self-destructive, behaviors.  Addiction is the most severe form of a full spectrum of substance use disorders, and is a medical illness caused by repeated misuse of a substance or substances.[10]  Without treatment and engagement in recovery activities, addiction is progressive and can result in unemployment, homelessness, disability and premature death.

44.    Substance use disorder treatment is difficult and the challenges of recovery from addiction are many, which can involve cycles of recurrence and remission before long-term recovery is realized.  Timely access to treatment and continuing care, including RTC, PHP, IOP and OP treatment, medication management, psychological testing, counseling and behavioral therapies, social support and supportive sober living environments, are critical for people to recover from addiction and reclaim active and meaningful lives.  Clinical laboratory services are recognized as an appropriate and important diagnostic procedure in substance

---

[9]  The human impact of the opioid epidemic – from babies born dependent, the emotional toll on individuals with a substance use disorder, and that of their families and communities, to the tens of thousands of lives cut short each year – has been tremendous.  Now, reports show that the economic impact has been just as shocking, with the drug crisis costing the U.S. economy $1 trillion since 2001 and likely to cost the economy an additional $500 billion by 2020 if the current rates of addiction and overdose remain steady.  See Altarum, Solutions to Advance Health: Economic Toll of Opioid Crisis in U.S. Exceeded $1 Trillion Since 2001 (February 13, 2018), retrieved on June 5, 2019 from https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001.

[10]  *See* National Institute of Drug Addiction, The Science of Drug Use and Addiction: The Basics, retrieved on May 29, 2019 from https://www.drugabuse.gov/publications/media-guide/science-drug-use-addiction-basics; *see also*, American Society of Addiction Medicine, Public Policy Statement: Definition of Addiction, retrieved on June 13, 2019 from https://www.asam.org/docs/default-source/public-policy-statements/1definition_of_addiction_long_4-11.pdf?sfvrsn=a8f64512_4.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

use disorder and mental health treatment as such services promote prevention, diversion, early detection, and lifelong recovery from addiction. Such testing is designed to provide accurate results that help physicians and treatment clinicians create a scientifically designed drug monitoring strategy for optimal treatment outcomes, which includes testing for accurate prescription therapy and medication assisted treatment.[11]

45.     Families and individuals purchase health insurance to help cover the costs of health care, including the costs of substance use disorder and mental health treatment. Health insurance is supposed to provide people with peace of mind and security, and provide them with access and options for life-sustaining and life-saving health care while preventing families and individuals from experiencing financial crises, such as bankruptcy or home foreclosure, or being forced to choose between paying for rent, utilities and food or paying for necessary health care costs.

46.     Traditionally, insurers and employers have covered treatment for mental health conditions, including substance use disorders, less favorably than treatment for physical health conditions, including higher cost-sharing obligations for patients, more restrictive limits on the number of inpatient days and outpatient visits, and more onerous prior authorization requirements. To address this unequal treatment, Congress first passed a mental health parity law in 1996, and many states followed suit in the following decade by passing laws of their own. Among other limitations, however, the 1996 act did not address the treatment of substance use disorders. Congress addressed this gap in passing the historic Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), 42 U.S.C. § 300gg-26, which, among other things, prohibits most plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

---

[11] *See* American Society of Addiction Medicine, Public Policy Statement on Drug Testing as a Component of Addiction Treatment and Monitoring Programs and in other Clinical Settings, retrieved on May 29, 2019 from https://www.asam.org/docs/default-source/public-policy-statements/1drug-testing---clinical-10-10.pdf.

1001 et seq., from imposing different treatment limits, cost-sharing and in-network and out-of-network coverage on mental health and substance use disorder treatment than are imposed on other medical and surgical services.[12]  Furthermore, ERISA requires fiduciaries to act solely in the interests of plan participants and beneficiaries, and to decide claims for health care benefits in accordance with plan documents and under a full and fair procedure.

47.  The Patient Protection and Affordable Care Act of 2010 ("PPACA"), 42 U.S.C. §§ 18001, *et seq.*, also known as the Affordable Care Act or Obamacare, requires a range of health plans, both inside and outside of the exchanges, to provide a core package of essential health benefits including mental health and substance use disorder services and laboratory services.  42 U.S.C. § 18022.  The PPACA extends the impact of the MHPAEA so that many health plans must offer coverage for mental health and substance use disorder services and laboratory services with at least an equal level of benefits as the plans offer for the treatment of medical and surgical benefits.  However, as President Donald J. Trump's commission on the opioid crisis wrote in its November 2017 report, "health insurers are not following the federal law requiring parity in the reimbursement for mental health and addiction [;] [t]hey must be held responsible."[13]

---

[12]  California has its own Mental Health Parity Act ("MHPA"), codified in Insurance Code section 10144.5 and Health and Safety Code section 1374.72, which, like the MHPAEA, requires mental health care coverage to be provided "under the same terms and conditions applied to other medical conditions."  California law also requires health care plans to "provide all covered mental health and substance use disorder benefits in compliance with the [MHPAEA] and all rules, regulations, and guidance issued" pursuant to federal laws.  Cal. Ins. Code §§ 10144.4, 10112.27; Cal. Health & Safety Code § 1374.76.

[13]  *See* President's Commission on Combatting Drug Addiction and the Opioid Crisis, Final Report, at pp. 9 and 122, retrieved on May 23, 2019 from https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf.  Roster of Commissioners include Governor Chris Christie, Chairman, Governor Charlie Baker, Governor Roy Cooper, Congressman Patrick J. Kennedy, Professor Bertha Madras, Ph.D., Florida Attorney General Pam Bondi.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

## DEFENDANTS' SCHEME TO DENY ACCESS AND COVERAGE FOR CRITICALLY-NEEDED SUBSTANCE USE DISORDER TREATMENT

48.    Despite the above statutory requirements, and the obvious individual and public health interests in timely access to and coverage for substance use disorder and mental health treatment and laboratory services, Defendants, and each of them and their controlled agents and/or undisclosed principals, are engaged in unfair, unreasonable, incomplete, fraudulent and systematic policies, practices and decisions (against the substance use disorder and mental health treatment profession as a whole and Defendants' insureds/members in need of substance use disorder and mental health treatment) that have and continue to result in the unlawful and fraudulent denial, underpayment, delay and/or flat-out refusal to authorize and decide access, coverage and claims for mental health and substance use disorder treatment and laboratory services for patients whose plans promise, and the law requires, access to and coverage for such treatment, services and benefits. Defendants' systematic practices have and continue to result in restrictive prior authorization requirements and restrictive limits on the number of substance use disorder and mental health treatment days and tests.  Defendants' access, coverage and claims-handling policies, practices and decisions are imposing unlawful barriers between patients and life-saving substance use disorder and mental health treatment they desperately need.  And Defendants are doing this in the middle of an opioid and addiction epidemic!  Defendants' impermissible barriers to substance use disorder and mental health treatment and laboratory services must be removed and Defendants must be held responsible for placing profits over patients in a life and death situation.

49.    Defendants' substance use disorder and mental health treatment and laboratory access, coverage and claims-handling policies, practices and decisions as a whole violate the law and the plan documents.  For instance, Plaintiffs are informed and believe, and based thereon allege, that Defendants refuse to authorize

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

access and coverage for RTC treatment because a facility does not have an *optional* state incidental medical license.[14]  Plaintiffs are informed and believe, and based thereon allege, that Defendants unreasonably limit the number of RTC treatment days, and impermissibly and unreasonably require preauthorization for PHP and IOP treatment and then limits the number of treatment days at each level of care.[15] Plaintiffs are further informed and believe, and based thereon allege, that Defendants reimburse RTC, PHP and IOP levels of care at nominal percentages of covered charges.  Moreover, Plaintiffs are informed and believe, and based thereon allege, that Defendants refuse to reimburse OP claims and refuse to reimburse claims for breathalyzer tests, counseling services and services of treatment case managers.  Further, Plaintiffs are informed and believe, and based thereon allege, that Defendants utilize illegal and overly restrictive medical necessity criteria and guidelines in order to deny claims and profit over the health and safety of their insureds, and utilize improper single bundled rates on claims for covered individuals

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

---

[14]  Cal. Health & Safety Code § 11834.026(a).  Moreover, California law provides that health insurers may not "in any manner … direct, participate in, or control the selection of the hospital or health facility … from who the insured secures services … except that an insurer may negotiate and enter into contracts for alternative rates of payment with institutional providers, and offer the benefit of these alternative rates to insures who select these providers." Cal. Ins. Code § 10133.

[15]  Under California law, once a health insurer authorizes a specific type of treatment covered under a plan and the provider has provided that treatment in good faith and pursuant to the authorization, the insurer cannot rescind or modify that authorization for any reason.  Cal. Ins. Code § 796.04; Cal. Health & Safety Code § 1371.8. Moreover, California law requires that where health insurers cannot provide their insureds/members access to needed healthcare providers on an "in-network" basis, the insurers shall pay any "out-of-network" provider the amounts necessary to limit the out-of-pocket cost to the patient as if an in-networker provider had provided the same treatment and services.  In effect, this makes an out-of-network provider eligible to receive almost 100 percent of its billed charges.  Cal. Ins. Code § 10133.5; Cal. Code Regs. tit. 10, § 2240.1. Further, health insurers are required to reimburse health care providers at almost 100 percent of the billed charges for emergency services.  Cal. Ins. Code § 10112.7; Cal. Health & Safety Code § 1317; Cal. Code Regs., tit. 28, § 1300.67.

in substance use disorder treatment.[16]  In addition, Plaintiffs are informed and believe, and based thereon allege, that Defendants refuse to pay for claims at all levels of care based on purported overpayments for substance use disorder and laboratory claims of other patients covered by other UnitedHealthcare plans.[17] Plaintiffs are also informed and believe, and based thereon allege, that Defendants refuse to pay for clinical laboratory claims as either beyond the numerical limitation and/or simply not covered or reimbursable.  Plaintiffs are further informed and believe, and based thereon allege, that Defendants make payments on claims based on inapplicable Medicare rates and demand refunds on other claims that they assert should have been paid at inapplicable Medicare rates.[18]

50.     Plaintiffs are informed and believe, and based thereon allege, that Defendants' objective is to deny their insureds/members access to and coverage for critically-needed substance use disorder RTC treatment, limit the number of authorized RTC, PHP and IOP substance use disorder treatment days, rush their insureds into an OP substance use disorder treatment level of care, refuse to reimburse OP claims, deny and/or underpay all other substance use disorder treatment and laboratory claims, and then demand refunds on paid claims and subject the remaining claims to improper cross-plan offsets and inapplicable Medicare rates, all in violation of the law and the plan documents and to the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

---

[16]  *See Wit/Alexander v. United Behavioral Health*, 2019 WL 1033730, at *53 (N.D. Cal. Mar. 5, 2019) (concluding insurer violated "its duty of loyalty, its duty of care, and its duty to comply with plan terms by adopting Guidelines that are unreasonable and that do not reflect generally accepted standards of care"); *see also*, October 3, 2019 Consent Order issued by the Insurance Department of the Commonwealth of Pennsylvania (Dkt. No. MC-18-07-010), whereby the Consent Order incorporates all of the findings and conclusions contained in the Pennsylvania Insurance Department's recent "Market Conduct Examination Report" of UnitedHealthcare Insurance Company's substance use disorder coverage and claims practices.

[17]  *See Peterson v. UnitedHealth Group, Inc.* (8th Cir. 2019) 913 F.3d 769, 776 (rejecting UnitedHealthcare's interpretation of its policies as permitting cross-plan offsetting).

[18]  The California Department of Insurance found and concluded in its July 23, 2018 Order to Show Cause *In the Matter of the Certificate of Authority of Health Net Life Insurance Company* (CDI File No. UPA-2016-00005), that Medicare does not provide a rate for inpatient or outpatient substance use disorder treatment provider charges and that substituting a bundled per diem Medicare rate for such treatment charges violates state and federal parity laws.

---

- 26 -

detriment of Defendants' insureds in need of life-saving substance use disorder and
mental health treatment, and to the detriment of substance use disorder treatment
providers and clinical laboratories, like Plaintiffs.

## **DEFENDANTS' SCHEME SPECIFIC TO PLAINTIFFS**

### **DR Recovery**

51.     DR Recovery is an out-of-network substance use disorder treatment
provider and clinical laboratory.  DR Recovery provides treatment and services to
individuals in the process of recovering from substance use disorders.  DR Recovery
provided medically necessary, verified, preauthorized and covered substance use
disorder treatment and laboratory services to 74 individuals with health insurance
that was sold, insured, managed and/or administered by Defendants.  The treatment
and services provided by DR Recovery include PHP, IOP, OP, treatment planning,
counseling and behavioral therapies, case management services, and laboratory
services.

52.     Defendants' health insurance plans, for each of the 74 insureds at issue,
provide coverage for out-of-network substance use disorder treatment and
laboratory services.  In this regard, the plans, and each of them, provide that out-of-
network substance use disorder benefits include the following levels of care: RTC,
PHP, IOP, and OP.  The plans also provide that covered out-of-network substance
use disorder services include: diagnostic evaluations, assessment and treatment
planning, treatment and/or procedures, medication management and other associated
treatment, psychological testing, referral services, individual, family and group
therapy, provider-based case management services, and crisis intervention.  The
plans further provide coverage for out-of-network laboratory benefits, which include
the facility charge and the charge for supplies and equipment, physician services for
pathologists, and presumptive drug tests and definitive drug tests.

53.     Defendants' health insurance plans, for each of the 74 insureds at issue,
pay benefits for out-of-network substance use disorder treatment and laboratory

services, including, but not limited to, RTC, PHP, IOP, OP, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  DR Recovery is informed and believes, and based thereon alleges, that each of the 74 insureds had already met their annual out-of-pocket maximum at the time of admission into DR Recovery's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  DR Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

54.   DR Recovery obtained an oral and written assignment of benefits from each of the 74 insureds at issue, by which Defendants' insureds intended to, and did, assign to DR Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, DR Recovery rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to DR Recovery through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that DR Recovery would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, DR Recovery rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that DR Recovery

THIRD AMENDED CONSOLIDATED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

was treating, and would continue to treat, their insureds, and Defendants were, at all times, fully aware of DR Recovery's charges for the treatment and services rendered.

55.    After providing covered treatment and services to the 74 insureds at issue, DR Recovery submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay DR Recovery the applicable plan percentage of its covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to DR Recovery during the verification and benefits and preauthorization process for each of the 74 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like DR Recovery, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying DR Recovery per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to DR Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid DR Recovery a mere 9% of its covered charges.  It was only after DR Recovery rendered the treatment and services at issue that Defendants refused to properly compensate DR Recovery for the covered treatment and services rendered to Defendants' insureds.

56.    During the claim submission and payment process, Defendants put DR Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and

information from DR Recovery, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  DR Recovery complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse DR Recovery for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide DR Recovery and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide DR Recovery and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny DR Recovery (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

57.   As a result, DR Recovery has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to DR Recovery, the interruption in DR Recovery's business, lost business opportunities, lost profits and other consequences, and moreover, DR Recovery is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**MMR Services**

58.   MMR Services is an out-of-network clinical laboratory.  MMR Services provides laboratory services to individuals in the process of recovering from substance use disorders.  MMR Services provided medically necessary,

verified, preauthorized and covered laboratory services to 212 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The services provided by MMR Services include presumptive and definitive drug tests.

59.     Defendants' health insurance plans, for each of the 212 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

60.     Defendants' health insurance plans, for each of the 212 insureds at issue, pay benefits for out-of-network laboratory services at varying percentages of covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  MMR Services is informed and believes, and based thereon alleges, that each of the 212 insureds had already met their annual out-of-pocket maximum at the time they first received services from MMR Services, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  MMR Services is informed and believes, and based thereon alleges, that at all times relevant herein

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   Defendants had an inadequate network of clinical laboratories.

2       61.    MMR Services obtained an oral and written assignment of benefits

3   from each of the 212 insureds at issue, by which Defendants' insureds intended to,

4   and did, assign to MMR Services not only rights to payment of claims but to assert

5   all rights and causes of action against Defendants in connection with such claims.

6   In reliance on the assignments of benefits, MMR Services rendered the subject

7   services to Defendants' insureds/members.  Moreover, Defendants confirmed,

8   represented, promised and warranted to MMR Services through the required

9   verification of benefits and the preauthorization process, that each of the insureds

10  and their respective out-of-network treatments and services were covered by health

11  insurance plans issued, managed and/or administered by Defendants and that MMR

12  Services would be properly paid for treating and providing services to Defendants'

13  insureds/members.  In reliance on Defendants' coverage representations and

14  payment promises, MMR Services rendered the subject services to Defendants'

15  insureds/members.  At all times relevant herein, Defendants knew that MMR

16  Services was treating and providing services, and would continue to treat and

17  provide services, to their insureds, and Defendants were, at all times, fully aware of

18  MMR Services' charges for the treatment and services rendered.

19      62.    After providing covered treatment and services to the 212 insureds at

20  issue, MMR Services submitted its claims to Defendants for payment.  Defendants

21  were obligated – under the law and the policies – to pay MMR Services the

22  applicable plan percentage of its covered charges (between 50% to 90% of covered

23  charges, with the majority of plans paying out-of-network benefits at 70% of

24  covered charges (minus any outstanding insured cost-sharing amounts)) until the

25  insured's nominal annual out-of-pocket maximum is met at which time Defendants

26  pay 100%.  Defendants also advised, confirmed and promised to MMR Services

27  during the verification and benefits and preauthorization process for each of the 212

28  insureds, that the out-of-network benefits paid by Defendants to out-of-network

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

providers, like MMR Services, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying MMR Services per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to MMR Services, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid MMR Services a mere 27.01% of its covered charges.  It was only after MMR Services rendered the treatment and services at issue that Defendants refused to properly compensate MMR Services for the covered treatment and services rendered to Defendants' insureds.

63.    During the claim submission and payment process, Defendants put MMR Services on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from MMR Services, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  MMR Services complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse MMR Services for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide MMR Services and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide MMR Services and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims

THIRD AMENDED CONSOLIDATED COMPLAINT

processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny MMR Services (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

64.    As a result, MMR Services has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to MMR Services, the interruption in MMR Services' business, lost business opportunities, lost profits and other consequences, and moreover, MMR Services is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**TML Recovery**

65.    TML Recovery is an out-of-network substance use disorder treatment provider and clinical laboratory.  TML Recovery provides treatment and services to individuals in the process of recovering from substance use disorders.  TML Recovery provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 223 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by TML Recovery include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services.

66.    Defendants' health insurance plans, for each of the 223 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention. The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

67. Defendants' health insurance plans, for each of the 223 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. TML Recovery is informed and believes, and based thereon alleges, that each of the 223 insureds had already met their annual out-of-pocket maximum at the time of admission into TML Recovery's program, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. TML Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

68. TML Recovery obtained an oral and written assignment of benefits from each of the 223 insureds at issue, by which Defendants' insureds intended to, and did, assign to TML Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims. In reliance on the assignments of benefits, TML Recovery rendered the subject

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to TML Recovery through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that TML Recovery would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, TML Recovery rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that TML Recovery was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of TML Recovery's charges for the treatment and services rendered.

69.    After providing covered treatment and services to the 223 insureds at issue, TML Recovery submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay TML Recovery the applicable plan percentage of its covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to TML Recovery during the verification and benefits and preauthorization process for each of the 223 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like TML Recovery, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying TML Recovery per the plan documents and the law, and in accordance with Defendants' agreements,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

representations and promises to TML Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid TML Recovery a mere 13.61% of its covered charges.  It was only after TML Recovery rendered the treatment and services at issue that Defendants refused to properly compensate TML Recovery for the covered treatment and services rendered to Defendants' insureds.

70.     During the claim submission and payment process, Defendants put TML Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from TML Recovery, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  TML Recovery complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse TML Recovery for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide TML Recovery and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide TML Recovery and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny TML Recovery (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

71.    As a result, TML Recovery has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to TML Recovery, the interruption in TML Recovery's business, lost business opportunities, lost profits and other consequences, and moreover, TML Recovery is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**Woman's Recovery**

72.    Woman's Recovery is an out-of-network substance use disorder treatment provider.  Woman's Recovery provides treatment and services to individuals in the process of recovering from substance use disorders.  Woman's Recovery provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 37 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Woman's Recovery include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

73.    Defendants' health insurance plans, for each of the 37 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

THIRD AMENDED CONSOLIDATED COMPLAINT

74. Defendants' health insurance plans, for each of the 37 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Woman's Recovery is informed and believes, and based thereon alleges, that each of the 37 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. Woman's Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

75. Woman's Recovery obtained an oral and written assignment of benefits from each of the 37 insureds at issue, by which Defendants' insureds intended to, and did, assign to Woman's Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims. In reliance on the assignments of benefits, Woman's Recovery rendered the subject treatment and services to Defendants' insureds/members. Moreover, Defendants confirmed, represented, promised and warranted to Woman's Recovery through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Woman's Recovery would be properly paid for treating Defendants' insureds/members. In reliance on Defendants' coverage representations and payment promises, Woman's Recovery rendered the subject

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Woman's Recovery was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of the charges for the treatment and services rendered by Woman's Recovery.

76.     After providing covered treatment and services to the 37 insureds at issue, Woman's Recovery submitted its claims to Defendants for payment. Defendants were obligated – under the law and the policies – to pay Woman's Recovery the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to Woman's Recovery during the verification and benefits and preauthorization process for each of the 37 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Woman's Recovery, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Woman's Recovery per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Woman's Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Woman's Recovery a mere 25.30% of its covered charges.  It was only after Woman's Recovery rendered the treatment and services at issue that Defendants refused to properly compensate Woman's Recovery for the covered treatment and services rendered to Defendants' insureds.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

77.    During the claim submission and payment process, Defendants put Woman's Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Woman's Recovery, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Woman's Recovery complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Woman's Recovery for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Woman's Recovery and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Woman's Recovery and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Woman's Recovery (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

78.    As a result, Woman's Recovery has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Woman's Recovery, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, Woman's Recovery is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

## **Kool Living**

79.     Kool Living is an out-of-network substance use disorder treatment provider.  Kool Living provides treatment and services to individuals in the process of recovering from substance use disorders.  Kool Living provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 147 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Kool Living include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

80.     Defendants' health insurance plans, for each of the 147 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

81.     Defendants' health insurance plans, for each of the 147 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Kool Living is informed and believes, and based

thereon alleges, that each of the 147 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Kool Living is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

82.     Kool Living obtained an oral and written assignment of benefits from each of the 147 insureds at issue, by which Defendants' insureds intended to, and did, assign to Kool Living not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, Kool Living rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Kool Living through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Kool Living would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, Kool Living rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Kool Living was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of Kool Living's charges for the treatment and services rendered.

83.     After providing covered treatment and services to the 147 insureds at issue, Kool Living submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay Kool Living the applicable plan percentage of its covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

(minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to Kool Living during the verification and benefits and preauthorization process for each of the 147 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Kool Living, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Kool Living per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Kool Living, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Kool Living a mere 27.44% of its covered charges.  It was only after Kool Living rendered the treatment and services at issue that Defendants refused to properly compensate Kool Living for the covered treatment and services rendered to Defendants' insureds.

84. During the claim submission and payment process, Defendants put Kool Living on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Kool Living, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims. Kool Living complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Kool Living for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide Kool Living and the insureds with adequate notice and/or explanation for the denial of benefits, payments or

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

reimbursement of claims, and failed and refused to provide Kool Living and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Kool Living (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

85.    As a result, Kool Living has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Kool Living, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, Kool Living is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**Pacific Palms**

86.    Pacific Palms is an out-of-network substance use disorder treatment provider.  Pacific Palms provides treatment and services to individuals in the process of recovering from substance use disorders.  Pacific Palms provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 162 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Pacific Palms include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

87.    Defendants' health insurance plans, for each of the 162 insureds at issue, provide coverage for out-of-network substance use disorder treatment and

THIRD AMENDED CONSOLIDATED COMPLAINT

laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

88.    Defendants' health insurance plans, for each of the 162 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 85% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Pacific Palms is informed and believes, and based thereon alleges, that each of the 162 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Pacific Palms is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

89.    Pacific Palms obtained an oral and written assignment of benefits from each of the 162 insureds at issue, by which Defendants' insureds intended to, and did, assign to Pacific Palms not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, Pacific Palms rendered the subject treatment

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Pacific Palms through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Pacific Palms would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, Pacific Palms rendered the subject treatment and services to Defendants' insureds/members. At all times relevant herein, Defendants knew that Pacific Palms was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of Pacific Palms' charges for the treatment and services rendered.

90.     After providing covered treatment and services to the 162 insureds at issue, Pacific Palms submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay Pacific Palms the applicable plan percentage of its covered charges (between 50% to 85% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to Pacific Palms during the verification and benefits and preauthorization process for each of the 162 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Pacific Palms, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 85% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Pacific Palms per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Pacific

Palms, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Pacific Palms a mere 19.67% of its covered charges.  It was only after Pacific Palms rendered the treatment and services at issue that Defendants refused to properly compensate Pacific Palms for the covered treatment and services rendered to Defendants' insureds.

91.     During the claim submission and payment process, Defendants put Pacific Palms on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Pacific Palms, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Pacific Palms complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Pacific Palms for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide Pacific Palms and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Pacific Palms and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Pacific Palms (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

92.     As a result, Pacific Palms has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to Pacific Palms, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, Pacific Palms is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**Inland Detox**

93.     Inland Detox is an out-of-network substance use disorder treatment provider.  Inland Detox provides treatment and services to individuals in the process of recovering from substance use disorders.  Inland Detox provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 72 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Inland Detox include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

94.     Defendants' health insurance plans, for each of the 72 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

95.     Defendants' health insurance plans, for each of the 72 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 49 -

THIRD AMENDED CONSOLIDATED COMPLAINT

limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 85% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Inland Detox is informed and believes, and based thereon alleges, that each of the 72 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Inland Detox is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

96.     Inland Detox obtained an oral and written assignment of benefits from each of the 72 insureds at issue, by which Defendants' insureds intended to, and did, assign to Inland Detox not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, Inland Detox rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Inland Detox through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Inland Detox would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, Inland Detox rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Inland Detox was treating and providing services, and would continue to treat and provide services, to their

insureds, and Defendants were, at all times, fully aware of Inland Detox' charges for the treatment and services rendered.

97.     After providing covered treatment and services to the 72 insureds at issue, Inland Detox submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay Inland Detox the applicable plan percentage of its covered charges (between 50% to 85% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to Inland Detox during the verification and benefits and preauthorization process for each of the 72 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Inland Detox, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 85% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Inland Detox per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Inland Detox, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Inland Detox a mere 36.49% of its covered charges.  It was only after Inland Detox rendered the treatment and services at issue that Defendants refused to properly compensate Inland Detox for the covered treatment and services rendered to Defendants' insureds.

98.     During the claim submission and payment process, Defendants put Inland Detox on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Inland Detox, over and over again.  This was all an

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

attempt by Defendants, and each of them, to avoid processing and paying the claims. Inland Detox complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Inland Detox for the covered treatment and services provided to Defendants' insureds. Defendants likewise failed and refused to provide Inland Detox and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Inland Detox and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Inland Detox (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

99.    As a result, Inland Detox has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the hundreds of thousands of dollars, amounts owed in accordance with Defendants' payment promises to Inland Detox, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, Inland Detox is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**SCAC**

100.    SCAC is an out-of-network substance use disorder treatment provider. SCAC provides treatment and services to individuals in the process of recovering from substance use disorders.  SCAC provided medically necessary, verified,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**THIRD AMENDED CONSOLIDATED COMPLAINT**

preauthorized and covered substance use disorder treatment and services to 65 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by SCAC include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

101.   Defendants' health insurance plans, for each of the 65 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

102.   Defendants' health insurance plans, for each of the 65 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 85% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus and outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  SCAC is informed and believes, and based thereon alleges, that each of the 65 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  SCAC is informed and believes, and based thereon alleges, that

at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

103.   SCAC obtained an oral and written assignment of benefits from each of the 65 insureds at issue, by which Defendants' insureds intended to, and did, assign to SCAC not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, SCAC rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to SCAC through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that SCAC would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, SCAC rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that SCAC was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of SCAC's charges for the treatment and services rendered.

104.   After providing covered treatment and services to the 65 insureds at issue, SCAC submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay SCAC the applicable plan percentage of its covered charges (between 50% to 85% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to SCAC during the verification and benefits and preauthorization process for each of the 65 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like SCAC, for

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 85% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying SCAC per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to SCAC, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid SCAC a mere 34.17% of its covered charges.  It was only after SCAC rendered the treatment and services at issue that Defendants refused to properly compensate SCAC for the covered treatment and services rendered to Defendants' insureds.

105.   During the claim submission and payment process, Defendants put SCAC on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from SCAC, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  SCAC complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse SCAC for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide SCAC and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide SCAC and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

illegally delay and deny SCAC (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

106.   As a result, SCAC has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to SCAC, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, SCAC is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

## **AHA**

107.   AHA is an out-of-network substance use disorder treatment provider and clinical laboratory.  AHA provides treatment and services to individuals in the process of recovering from substance use disorders.  AHA provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 70 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by AHA include RTC and laboratory services.

108.   Defendants' health insurance plans, for each of the 70 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

109.    Defendants' health insurance plans, for each of the 70 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  AHA is informed and believes, and based thereon alleges, that each of the 70 insureds had already met their annual out-of-pocket maximum at the time of admission into AHA's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  AHA is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

110.    AHA obtained an oral and written assignment of benefits from each of the 70 insureds at issue, by which Defendants' insureds intended to, and did, assign to AHA not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, AHA rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to AHA through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that AHA would be properly paid

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, AHA rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that AHA was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of AHA's charges for the treatment and services rendered.

111.   After providing covered treatment and services to the 70 insureds at issue, AHA submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay AHA the applicable plan percentage of its covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to AHA during the verification and benefits and preauthorization process for each of the 70 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like AHA, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying AHA per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to AHA, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid AHA a mere 2.60% of its covered charges.  It was only after AHA rendered the treatment and services at issue that Defendants refused to properly compensate AHA for the covered treatment and services rendered to Defendants' insureds.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

112.   During the claim submission and payment process, Defendants put AHA on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from AHA, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  AHA complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse AHA for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide AHA and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide AHA and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny AHA (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

113.   As a result, AHA has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to AHA, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, AHA is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

THIRD AMENDED CONSOLIDATED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**Creative Care**

114.   Creative Care is an out-of-network substance use disorder treatment provider.  Creative Care provides treatment and services to individuals in the process of recovering from substance use disorders.  At all times relevant herein, Creative Care provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 23 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Creative Care include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

115.   Defendants' health insurance plans, for each of the 23 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

116.   Defendants' health insurance plans, for each of the 23 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

pay 100%.  Creative Care is informed and believes, and based thereon alleges, that each of the 23 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Creative Care is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

117.   Creative Care obtained an oral and written assignment of benefits from each of the 23 insureds at issue, by which Defendants' insureds intended to, and did, assign to Creative Care not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, Creative Care rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Creative Care through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Creative Care would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, Creative Care rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Creative Care was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of Creative Care's charges for the treatment and services rendered.

118.   After providing covered treatment and services to the 23 insureds at issue, Creative Care submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay Creative Care the applicable plan percentage of its covered charges (between 50% to 80% of covered

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to Creative Care during the verification and benefits and preauthorization process for each of the 23 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Creative Care, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Creative Care per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Creative Care, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Creative Care a mere 0.44% of its covered charges.  It was only after Creative Care rendered the treatment and services at issue that Defendants refused to properly compensate Creative Care for the covered treatment and services rendered to Defendants' insureds.

119.   During the claim submission and payment process, Defendants put Creative Care on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Creative Care, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Creative Care complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, inter alia, the plans and/or repricing agreements, Defendants refused to properly reimburse Creative Care for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Creative Care and the

THIRD AMENDED CONSOLIDATED COMPLAINT

insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Creative Care and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Creative Care (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

120.   As a result, Creative Care has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the hundreds of thousands of dollars, amounts owed in accordance with Defendants' payment promises to Creative Care, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, Creative Care is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**JMG**

121.   JMG is an out-of-network substance use disorder treatment provider. JMG provides treatment and services to individuals in the process of recovering from substance use disorders.  At all times relevant herein, JMG provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 60 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by JMG include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

122.   Defendants' health insurance plans, for each of the 60 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

123.   Defendants' health insurance plans, for each of the 60 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  JMG is informed and believes, and based thereon alleges, that each of the 60 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  JMG is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

124.   JMG obtained an oral and written assignment of benefits from each of the 60 insureds at issue, by which Defendants' insureds intended to, and did, assign to JMG not only rights to payment of claims but to assert all rights and causes of

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

action against Defendants in connection with such claims. In reliance on the assignments of benefits, JMG rendered the subject treatment and services to Defendants' insureds/members. Moreover, Defendants confirmed, represented, promised and warranted to JMG through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that JMG would be properly paid for treating Defendants' insureds/members. In reliance on Defendants' coverage representations and payment promises, JMG rendered the subject treatment and services to Defendants' insureds/members. At all times relevant herein, Defendants knew that JMG was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of JMG's charges for the treatment and services rendered.

125. After providing covered treatment and services to the 60 insureds at issue, JMG submitted its claims to Defendants for payment. Defendants were obligated – under the law and the policies – to pay JMG the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to JMG during the verification and benefits and preauthorization process for each of the 60 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like JMG, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Instead of paying JMG per the plan documents and the law, and in accordance with

Defendants' agreements, representations and promises to JMG, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid JMG a mere 36.74% of its covered charges.  It was only after JMG rendered the treatment and services at issue that Defendants refused to properly compensate JMG for the covered treatment and services rendered to Defendants' insureds.

126.   During the claim submission and payment process, Defendants put JMG on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from JMG, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  JMG complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse JMG for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide JMG and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide JMG and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny JMG (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

127.   As a result, JMG has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

and the law in the hundreds of thousands of dollars, amounts owed in accordance with Defendants' payment promises to JMG, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, JMG is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

### **Valley Restoration**

128.   Valley Restoration is an out-of-network substance use disorder treatment provider.  Valley Restoration provides treatment and services to individuals in the process of recovering from substance use disorders.  At all times relevant herein, Valley Restoration provided medically necessary, verified, preauthorized and covered substance use disorder treatment and services to 39 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by Valley Restoration include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

129.   Defendants' health insurance plans, for each of the 39 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

130.   Defendants' health insurance plans, for each of the 39 insureds at issue, pay benefits for out-of-network substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

therapies, and case management services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Valley Restoration is informed and believes, and based thereon alleges, that each of the 39 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Valley Restoration is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers.

131.   Valley Restoration obtained an oral and written assignment of benefits from each of the 39 insureds at issue, by which Defendants' insureds intended to, and did, assign to Valley Restoration not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, Valley Restoration rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to Valley Restoration through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Valley Restoration would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants coverage representations and payment promises, Valley Restoration rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that Valley Restoration was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all

times, fully aware of Valley Restoration's charges for the treatment and services rendered.

132.   After providing covered treatment and services to the 39 insureds at issue, Valley Restoration submitted its claims to Defendants for payment. Defendants were obligated – under the law and the policies – to pay Valley Restoration the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Defendants also advised, confirmed and promised to Valley Restoration during the verification and benefits and preauthorization process for each of the 39 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like Valley Restoration, for all levels of substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Valley Restoration per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Valley Restoration, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Valley Restoration a mere 39.21% of its covered charges.  It was only after Valley Restoration rendered the treatment and services at issue that Defendants refused to properly compensate Valley Restoration for the covered treatment and services rendered to Defendants' insureds.

133.   During the claim submission and payment process, Defendants put Valley Restoration on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

documents and information from Valley Restoration, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  Valley Restoration complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse Valley Restoration for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide Valley Restoration and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Valley Restoration and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Valley Restoration (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

134.   As a result, Valley Restoration has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the hundreds of thousands of dollars, amounts owed in accordance with Defendants' payment promises to Valley Restoration, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, Valley Restoration is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**SCRCO**

135.   SCRCO is an out-of-network substance use disorder treatment provider

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

and clinical laboratory.  SCRCO provides treatment and services to individuals in the process of recovering from substance use disorders.  SCRCO provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 30 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by SCRCO include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services.

136.   Defendants' health insurance plans, for each of the 30 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

137.   Defendants' health insurance plans, for each of the 30 insureds at issue, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, case management services, and laboratory services, at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  SCRCO is

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

informed and believes, and based thereon alleges, that each of the 30 insureds had already met their annual out-of-pocket maximum at the time of admission into SCRCO's program, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  SCRCO is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.

138.   SCRCO obtained an oral and written assignment of benefits from each of the 30 insureds at issue, by which Defendants' insureds intended to, and did, assign to SCRCO not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, SCRCO rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to SCRCO through the required verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that SCRCO would be properly paid for treating Defendants' insureds/members.  In reliance on Defendants' coverage representations and payment promises, SCRCO rendered the subject treatment and services to Defendants' insureds/members.  At all times relevant herein, Defendants knew that SCRCO was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of SCRCO's charges for the treatment and services rendered.

139.   After providing covered treatment and services to the 30 insureds at issue, SCRCO submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay SCRCO the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**THIRD AMENDED CONSOLIDATED COMPLAINT**

the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to SCRCO during the verification and benefits and preauthorization process for each of the 30 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like SCRCO, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying SCRCO per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to SCRCO, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid SCRCO a mere 7.13% of its covered charges.  It was only after SCRCO rendered the treatment and services at issue that Defendants refused to properly compensate SCRCO for the covered treatment and services rendered to Defendants' insureds.

140.    During the claim submission and payment process, Defendants put SCRCO on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from SCRCO, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  SCRCO complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, inter alia, the plans and/or repricing agreements, Defendants refused to properly reimburse SCRCO for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide SCRCO and the insureds with adequate notice and/or

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide SCRCO and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair. Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny SCRCO (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

141.   As a result, SCRCO has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to SCRCO, the interruption in SCRCO's business, lost business opportunities, lost profits and other consequences, and moreover, SCRCO is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

**JD Recovery**

142.   JD Recovery is an out-of-network clinical laboratory.  JD Recovery provides laboratory services to individuals in the process of recovering from substance use disorders.  JD Recovery provided medically necessary, verified, preauthorized and covered laboratory services to 72 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The services provided by JD Recovery include presumptive and definitive drug tests.

143.   Defendants' health insurance plans, for each of the 72 insureds at issue, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

PHP, IOP, and OP.  The plans also provide that covered out-of-network substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

144.   Defendants' health insurance plans, for each of the 72 insureds at issue, pay benefits for out-of-network laboratory services at varying percentages of covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  JD Recovery is informed and believes, and based thereon alleges, that each of the 72 insureds had already met their annual out-of-pocket maximum at the time they first received services from JD Recovery, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  JD Recovery is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of clinical laboratories.

145.   JD Recovery obtained an oral and written assignment of benefits from each of the 72 insureds at issue, by which Defendants' insureds intended to, and did, assign to JD Recovery not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.  In reliance on the assignments of benefits, JD Recovery rendered the subject treatment and services to Defendants' insureds/members.  Moreover, Defendants confirmed, represented, promised and warranted to JD Recovery through the required

THIRD AMENDED CONSOLIDATED COMPLAINT

verification of benefits and the preauthorization process, that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that JD Recovery would be properly paid for treating and providing services to Defendants' insureds/members. In reliance on Defendants' coverage representations and payment promises, JD Recovery rendered the subject treatment and services to Defendants' insureds/members. At all times relevant herein, Defendants knew that JD Recovery was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of JD Recovery' charges for the treatment and services rendered.

146. After providing covered treatment and services to the 72 insureds at issue, JD Recovery submitted its claims to Defendants for payment. Defendants were obligated – under the law and the policies – to pay JD Recovery the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to JD Recovery during the verification and benefits and preauthorization process for each of the 72 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like JD Recovery, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Instead of paying JD Recovery per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to JD Recovery, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and

THIRD AMENDED CONSOLIDATED COMPLAINT

decisions – with an emphasis on profits over patients – and paid JD Recovery a mere 7.03% of its covered charges.  It was only after JD Recovery rendered the treatment and services at issue that Defendants refused to properly compensate JD Recovery for the covered treatment and services rendered to Defendants' insureds.

147.   During the claim submission and payment process, Defendants put JD Recovery on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from JD Recovery, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  JD Recovery complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, inter alia, the plans and/or repricing agreements, Defendants refused to properly reimburse JD Recovery for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide JD Recovery and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide JD Recovery and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny JD Recovery (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

148.   As a result, JD Recovery has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in the millions, amounts owed in accordance with Defendants' payment promises to JD Recovery, the interruption in JD Recovery' business, lost

THIRD AMENDED CONSOLIDATED COMPLAINT

business opportunities, lost profits and other consequences, and moreover, JD Recovery is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

### 12 South

149.   12 South is an out-of-network mental health and substance use disorder treatment provider.  12 South provides treatment and services to individuals in the process of recovering from mental health and substance use disorders.  At all times relevant herein, 12 South provided medically necessary, verified, preauthorized and covered mental health and substance use disorder treatment and services to 18 individuals with health insurance that was sold, insured, managed and/or administered by Defendants.  The treatment and services provided by 12 South include PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services.

150.   Defendants' health insurance plans, for each of the 18 insureds at issue, provide coverage for out-of-network mental health and substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network mental health and substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that covered out-of-network mental health and substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

151.   Defendants' health insurance plans, for each of the 18 insureds at issue, pay benefits for out-of-network mental health and substance use disorder treatment, including, but not limited to, RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, and case management services, at varying percentages of

covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to providers)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. 12 South is informed and believes, and based thereon alleges, that each of the 18 insureds had already met their annual out-of-pocket maximum at the time of admission into its program, or shortly thereafter. The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received. 12 South is informed and believes, and based thereon alleges, that at all times relevant herein Defendants had an inadequate network of mental health and substance use disorder treatment providers.

152. 12 South obtained an oral and written assignment of benefits from each of the 18 insureds at issue, by which Defendants' insureds intended to, and did, assign to 12 South not only rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims. In reliance on the assignments of benefits, 12 South rendered the subject treatment and services to Defendants' insureds/members. Moreover, Defendants confirmed, represented, promised and warranted to 12 South through the required verification of benefits and the preauthorization process that each of the insureds and their respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that 12 South would be properly paid for treating Defendants' insureds/members. In reliance on Defendants' coverage representations and payment promises, 12 South rendered the subject treatment and services to Defendants' insureds/members. At all times relevant herein, Defendants knew that 12 South was treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of 12 South's charges for the treatment and services rendered.

THIRD AMENDED CONSOLIDATED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

153.   After providing covered treatment and services to the 18 insureds at issue, 12 South submitted its claims to Defendants for payment.  Defendants were obligated – under the law and the policies – to pay 12 South the applicable plan percentage of its covered charges (between 50% to 80% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Defendants also advised, confirmed and promised to 12 South during the verification and benefits and preauthorization process for each of the 18 insureds, that the out-of-network benefits paid by Defendants to out-of-network providers, like 12 South, for all levels of mental health and substance use disorder treatment, is a percentage of its covered charges (between 50% to 80% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying 12 South per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to 12 South, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid 12 South a mere 1.38% of its covered charges.  It was only after 12 South rendered the treatment and services at issue that Defendants refused to properly compensate 12 South for the covered treatment and services rendered to Defendants' insureds.

154.   During the claim submission and payment process, Defendants put 12 South on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from 12 South, over and over again.  This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.  12 South complied with Defendants' repetitive requests and despite being released from the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

audits and promised payment pursuant to, *inter alia*, the plans and/or repricing agreements, Defendants refused to properly reimburse 12 South for the covered treatment and services provided to Defendants' insureds.  Defendants likewise failed and refused to provide 12 South and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide 12 South and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.  Defendants' audits, bogus TIN flag and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny 12 South (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with Defendants' representations and promises, and the law and plans.

155.   As a result, 12 South has suffered and continues to suffer general and incidental damages according to proof, including the benefits owed under the plans and the law in millions, amounts owed in accordance with Defendants' payment promises to 12 South, the interruption in its business, lost business opportunities, lost profits and other consequences, and moreover, 12 South is entitled to injunctive relief and statutory and prejudgment interest and attorney's fees against Defendants, and each of them.

## LEGAL EFFECT AND CONSEQUENCES OF DEFENDANTS' SCHEME

156.   Defendants' conduct at issue herein has had a severe and adverse effect on not only Plaintiffs, but also Defendants' insureds and the substance use disorder treatment profession as a whole.  Defendants' conduct has placed the lives of their insureds that are struggling with addiction in jeopardy, exposing the insureds and their families to significant financial and health risk, while simultaneously destroying or significantly damaging Plaintiffs and all similarly situated substance

use disorder treatment providers and clinical laboratories.

157.   Defendants' conduct breached agreements with Plaintiffs which arose when Plaintiffs' patients assigned benefits to Plaintiffs in writing, and when Defendants confirmed out-of-network coverage and promised payment to Plaintiffs, and when necessary, Defendants gave prior approval for the substance use disorder treatment and services that Plaintiffs provided to Defendants' insureds/members. Defendants' violated the implied covenant of good faith and fair dealing in said insurance contracts, rendering their actions in "bad faith."

158.   Upon information and belief, Plaintiffs allege that Defendants' conduct was wanton and willful, and undertaken to improve their balance sheets by placing profits over patients in a life and death situation.  In this regard, Defendants' substance use disorder treatment and related clinical laboratory guidelines, reimbursement policies and claims handlings processes and procedures were, and are, fraudulently flawed and tainted by Defendants' financial interests.

159.   Defendants' practices were also unfair, fraudulent and unlawful under California's Unfair Competition Law ("UCL") in that, as a part of their scheme to not pay or underpay Plaintiffs, and to prevent Plaintiffs from learning of Defendants' scheme for as long as possible, Defendants violated their claims handling obligations under ERISA and California law by providing either no, baseless, false, or dilatory reasons for not paying or underpaying Plaintiffs. Plaintiffs are thereafter entitled to injunctive relief and restitution under the UCL.

160.   Defendants' practices were similarly unfair, fraudulent and unlawful under state and federal law in that they violate the MHPAEA, while simultaneously constituting common law bad faith.  The MHPAEA is an antidiscrimination statute intended to ensure that coverage of mental health and substance use disorder treatment (such as Plaintiffs provide) is in "parity" with coverage of medical and surgical care.  Defendants, and each of them, have systematically treated substance use disorder treatment providers differently than medical and surgical providers in

California, and likely across the nation.

161.   Defendants' practices were likewise unfair, fraudulent and unlawful under state and federal law in that they violate the PPACA, which requires, among other things, insurers to provide benefits for essential mental health and substance use disorder treatment and laboratory services, with no pre-existing condition exclusions and no annual or lifetime dollar amount limits on coverage of such treatment services.

162.   Defendants' actions were further unfair, fraudulent and unlawful in that they violated other well established public policies, including those set forth in the California Unfair Insurance Practices Act ("UIPA"), as set forth in California Insurance Code sections 790, *et seq*.

163.   Defendants' insureds/members were also unlawfully, unfairly and fraudulently misled into believing that their health plans would provide coverage for care supplied by out-of-network substance use disorder treatment providers and clinical laboratories, such as Plaintiffs.

164.   Defendants, and each of them, never intended to provide the coverage mandated by the plans at issue and instead intended to not pay or to underpay substance use disorder treatment providers and laboratories throughout California, including Plaintiffs.  Defendants, and each of them, have ignored Plaintiffs' efforts to recover payment for the treatment and services provided, placing Plaintiffs in the untenable position of being forced to file this lawsuit in order to recover payments due under the law and plans, and in accordance with Defendants' out-of-network coverage representations and payment promises to Plaintiffs.

165.   Plaintiffs seek relief under their direct rights, written assigned rights from patients cheated out of their insurance benefits by Defendants, and as third-party beneficiaries of their patients' health insurance plans issued, managed and/or administered by Defendants.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

166.    Defendants have also tortuously breached the implied covenant of good faith and fair dealing in the underlying health insurance plans issued, managed and/or administered by Defendants, which rights have been assigned to Plaintiffs.

167.    The treatment and services at issue were provided by Plaintiffs to patients who at all relevant times had health insurance for the substance use disorder treatment and services that Plaintiffs provided and the health insurance plans were issued, managed and/or administered by Defendants, and each of them, or at the direction and under the control of Defendants.

168.    Defendants, and each of them, caused the events complained of herein to occur in the County of Orange and throughout the State of California, and likely across the nation.

169.    Plaintiffs provide substance use disorder treatment and laboratory services to individuals in the process of recovering from alcoholism and substance use disorders.  Plaintiffs' treatment includes a range of services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

170.    Defendants, and each of them, developed and marketed the subject health insurance plans to include coverage for substance use disorder treatment and laboratory services provided to their insureds by in-network providers ("INP") and out-of-network providers ("ONP") like Plaintiffs.

171.    The health insurance plans issued, managed and/or administered by Defendants, and each of them, are industry standard indemnity health insurance contracts that provide richer benefits (less out-of-pocket expense for insureds) for treatment and services that are obtained from INPs.  Such providers contract with Defendants to become part of their "network" and generally agree to accept a set

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

reduced rate of reimbursement in exchange for steerage of patients to their practices or facilities and payment within specified contractual timeframes.

172.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for a reimbursement rate for ONP services at a lesser percentage of the overall billed charges than the 100% reimbursement rate for INP services, less the insured's copayment, coinsurance and deductible, generally resulting in greater out-of-pocket expenses for Defendants' insureds.

173.   California law requires that the policy forms, such as those utilized in the health insurance plans issued, managed and/or administered by Defendants, and each of them, be filed with and approved by the CDI, and are generally not to be withdrawn from the insurance marketplace without an insurer meeting specific conditions.

174.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide coverage for, but not limited to, the following ONP substance use disorder treatment and services: RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services.

175.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide for the payment of services with an INP at 100% of the provider's billed charges set by contract, less the insured's copayment, coinsurance and deductible.  Services with an ONP are reimbursed at a lesser percentage of the provider's billed charges.

176.   The health insurance plans issued, managed and/or administered by Defendants, and each of them, provide that Defendants are required to remit claim payments directly to providers when the insured assigns his or her benefits to the provider in writing, and Defendants promised Plaintiffs that payments would be

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

made directly to Plaintiffs.

177.   When required by the health insurance plans issued, managed and/or administered by Defendants, and each of them, Plaintiffs' standard operating procedure was to obtain prior authorizations from Defendants for the substance use disorder treatment and services to be rendered.  Plaintiffs' standard operating procedure also included obtaining a verification of benefits from Defendants to ensure the patient is covered by the insurer and that the treatment and services are covered benefits under the plan.

178.   In communication with Plaintiffs, including telephone calls requesting verification of benefits and preauthorization, Defendants, and each of them, represented to Plaintiffs that the services provided to Defendants' insureds were covered and that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

179.   Specifically, for each of the 1,304 patients whose treatments are at issue, Plaintiffs contacted Defendants by phone and/or in writing before beginning such treatments.  Plaintiffs learned that the patients were validly covered by their plans with Defendants, and Plaintiffs informed Defendants of the proposed out-of-network treatments of Defendants' insureds, including the specific services to be provided and the billing codes for the same.  Defendants' represented, warranted and promised to Plaintiffs that the out-of-network benefits paid by Defendants to out-of-network providers, like Plaintiffs, for all levels of substance use disorder treatment and laboratory services, is a percentage of its covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual

THIRD AMENDED CONSOLIDATED COMPLAINT

1   out-of-pocket maximum is met at which time Defendants pay 100%.  Thereafter,
2   Plaintiffs treated and provided services to Defendants' insureds/members.

3   180.   Based upon the language of the health insurance plans issued, managed
4   and/or administered by Defendants, and each of them, and upon obtaining
5   verifications of benefits and prior authorizations from Defendants, and valid written
6   assignments, Plaintiffs and their patients insureds by Defendants, all 1,304 of them,
7   reasonably expected that Plaintiffs' claims would be paid promptly and consistent
8   with the law and the terms of the plans and/or the herein payment representations
9   and promises that Defendants, and each of them, made to Plaintiffs.

10   181.   Notwithstanding the verifications of benefits, prior authorizations,
11   coverage representations by Defendants, payment promises by Defendants, and
12   valid written assignments, Plaintiffs' claims for the majority of the substance use
13   disorder treatment and laboratory services provided to Defendants'
14   insureds/members have not been paid properly and require substantial interest
15   payments for violation of the applicable health plans, ERISA and California
16   insurance laws and regulations providing for the prompt payment of claims.

17   182.   Plaintiffs are entitled to payment for the substance use disorder
18   treatment and services provided to Defendants' insureds/members at the proper
19   reimbursement rates, pursuant to valid written assignments from their patients and
20   pursuant to Defendants' coverage representations and payment promises to
21   Plaintiffs.

22   183.   While the breaches alleged herein involved health insurance plans
23   issued, managed and/or administered by one or more of the Defendants and
24   Defendants' coverage representations and payment promises to Plaintiffs, each
25   Defendant, upon information and belief, conceived, directed, approved, or aided and
26   abetted the others in this bad faith scheme.

27   184.   In California, a health insurer must provide or arrange for the provision
28   of access to health care services in a timely manner.  Most health insurers, including

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Defendants, and each of them, seek to satisfy this duty by providing an adequate network of INPs for their insureds to choose from so they may receive the necessary treatment at the lowest expense to the insurer and the insured.

185.   A "network gap" or "network insufficiency" exists in a health insurer's network when either the health insurer, or the patient, is unable to secure the services of an INP for necessary treatment.  If a network gap exists, California law requires the insurer to secure the services of an ONP so the insurer can meet its legal and contractual obligations to provide or arrange for the provision of access to health care services in a timely manner.  In addition, emergency services, and sometimes urgently needed services, must be covered by an insurer with an ONP if the insurer has no network provider to provide the needed services.

186.   California law does not give a health insurer the right or ability to unilaterally set the price it will pay an ONP that provides services to one of the insurer's insureds in order to fill a network gap.

187.   Upon information and belief, there was a network gap with respect to substance use disorder treatment providers and laboratories in California to serve the tremendous number of insured patients in need of such treatment and services, due in large part to the opioid and addiction epidemic in California, and across the nation.

188.   Upon information and belief, there was a network gap with respect to substance use disorder treatment providers and laboratories required to treat Defendants' insureds/members, which caused some of Defendants' insureds to obtain their needed treatment and services with Plaintiffs, ONPs.

189.   In the health care industry, a "verification" of an insured's coverage for the contemplated treatment, or an "authorization" for such treatment, is understood by both the insurers and providers to be an agreement by the insurers to pay for such treatment.  For INPs, it is an agreement by the insurers to pay those providers based on previously negotiated rates between the insurer and those providers.  For ONPs,

it is an agreement by the insurers to pay those providers at their fully billed charges.

190.   Plaintiffs, as ONPs, after obtaining verifications of benefits and prior authorizations from Defendants, provided life-saving and medically necessary substance use disorder treatment and services to Defendants' insureds/members due to a network gap and are therefore entitled to recover payment for their treatment and services at their fully billed charges.

191.   While Plaintiffs have repeatedly demanded payment in full for the treatment and services provided to Defendants' insureds, Defendants, and each of them, have denied, delayed and incorrectly issued payment for Plaintiffs' claims even after requested records were copied, sent and received by Defendants.

192.   Defendants, and each of them, would respond to Plaintiffs' inquiries about the delay or errors in payment with false promises that payment would be made and/or a multitude of excuses.  Regardless of the excuses made by Defendants, and each of them, Plaintiffs did not receive proper claim payments for the covered substance use disorder treatment and services provided to Defendants' insureds/members.

193.   Upon information and belief, Defendants, and each of them, realized an immediate positive financial impact as a result of their misconduct alleged herein, cessation of substance use disorder treatment and laboratory claims payments, and forcing treatment providers, like Plaintiffs, through an expensive, administratively burdensome and indiscriminate audit, and not paying claims that are due and owed.

194.   Upon information and belief, Defendants, and each of them, undertook the actions alleged herein with the intent and designed purpose of not paying claims that are due and owed under the law and the plans, and in accordance with Defendants' coverage representations and payment promised to Plaintiffs, as part of a pattern and practice by Defendants, and each of them, that is unlawful, unfair and fraudulent, and thus violates, *inter alia*, California's UCL, state and federal regulations and ERISA, MHPAEA and PPACA.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

195.   Upon information and belief, Defendants, and each of them, undertook the actions alleged herein, in violation of numerous provisions of California's UIPA, without limitation, numerous subsections of California Insurance Code section 790.03, including misrepresentations to patients and providers, failing to acknowledge and act reasonably and promptly in response to communications, failing to adopt and implement reasonable standards for investigations, not attempting in good faith to effectuate prompt, fair and equitable settlement of claims, and compelling providers, like Plaintiffs, to institute litigation to recover amounts due and owed.

196.   Upon information and belief, Defendants, and each of them, developed a mechanism through their superior economic might to oppress substance use disorder treatment providers and laboratories, including Plaintiffs, forcing Plaintiffs and other treatment providers into a position where they can no longer afford to accept patients insured by Defendants, our with health plans managed and/or administered by Defendants, and resulting in significant and undue hardship to Plaintiffs (and the patient-insureds) and interference with Plaintiffs' contractual relationships with their patients and their prospective economic advantage.  And Defendants, and each of them, are doing this in the middle of an opioid and addiction epidemic!

## FIRST CAUSE OF ACTION

### Claims for Plan Benefits Under ERISA

### 29 U.S.C. §1132(a)(1)(B)

### Against All Defendants

197.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

198.   Plaintiffs are out-of-network substance use disorder treatment providers and clinical laboratories.  Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

as productive and contributing members of society. Plaintiffs provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 1,304 individuals with health insurance that was sold, insured, managed and/or administered by Defendants. The treatment and services provided by Plaintiffs include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.

199. Defendants' ERISA health insurance plans, for each of the 1,304 insureds at issue who had ERISA plans, provide coverage for out-of-network substance use disorder treatment and laboratory services. In this regard, the ERISA plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP. The plans also provide that out-of-network covered substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention. The plans further provide coverage for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

200. Plaintiffs allege this claim for relief in connection with their claims for substance use disorder treatment and laboratory services rendered to those of Defendants' 1,304 insureds with a health benefits plan governed by ERISA. This claim seeks to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B). Plaintiffs have standing to pursue these claims as assignees of the insureds' benefits under the ERISA plans. Defendants' insureds orally

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1  assigned benefits by their insurance company or health plan to Plaintiffs and

2  Plaintiffs obtained written assignments of benefits from the insureds at issue, by

3  which Defendants' insureds intended to, and did, assign to Plaintiffs not only rights

4  to payment of claims but to assert all rights and causes of action against Defendants

5  in connection with such claims.  As the assignees of benefits under the ERISA

6  plans, Plaintiffs are beneficiaries entitled to collect benefits under the terms of the

7  ERISA plans, and claimants for purposes of ERISA.

8       201.   Defendants' ERISA health plans pay benefits for out-of-network

9  substance use disorder treatment and laboratory services, including, but not limited

10  to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning,

11  treatment and/or procedures, medication management and other associated

12  treatment, psychological testing, referral services, individual, family and group

13  therapy, provider-based case management services, crisis intervention and

14  laboratory services at varying percentages of covered charges (between 50% to 90%

15  of covered charges, with the majority of plans paying out-of-network benefits at

16  70% of covered charges (minus any outstanding insured cost-sharing amounts,

17  which Defendants deduct from payments to Plaintiffs)) until the insured's nominal

18  annual out-of-pocket maximum is met, at which time Defendants pay 100%.  Each

19  of the 1,304 insureds at issue with an ERISA plan had already met his/her annual

20  out-of-pocket maximum at the time he/she first received services from Plaintiffs, or

21  shortly thereafter.  The ERISA plans also pay 100% of covered charges in the event

22  of a "network inadequacy" or "network gap" for the services received.  At all times

23  relevant herein, Defendants had an inadequate network of substance use disorder

24  treatment providers and clinical laboratories.

25       202.   The intended benefits set forth in Defendants' ERISA health plans are

26  the same in all material respects as to the claims at issue for those of Defendants'

27  1,304 insureds with a health benefits plan governed by ERISA, an example of which

28  is attached hereto as **Exhibit "A"** and incorporated herein by reference.  The

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 92 -

THIRD AMENDED CONSOLIDATED COMPLAINT

1  material terms of Defendants' ERISA health plans are set forth in the chart attached

2  as **Exhibit "B"** and incorporated herein by reference, which contains a sampling of

3  the common language describing the intended benefits and procedures for receiving

4  benefits found in 31 of Defendants' ERISA health plans at issue.

5      203.   The relevant plan terms as to the intended benefits, as reflected in the

6  example Exhibit A, and which are consistent with the terms found in Exhibit B, are

7  as follows:

| Benefits OON SUD | p. 68 | "Substance -Related and Addictive Disorders Services |
|---|---|---|
| | | Substance-Related and Addictive Disorders Services include those received on an inpatient and outpatient basis in a provider's office or at an Alternate Facility. All services must be provided by or under the direction of a properly qualified behavioral health provider. |
| | | Benefits include the following levels of care: |
| | | • Inpatient treatment.<br>• Residential Treatment.<br>• Partial Hospitalization/Day Treatment.<br>• Intensive Outpatient Treatment.<br>• Outpatient treatment. |
| | | Services include the following: |
| | | • Diagnostic evaluations, assessment and treatment planning. |
| | | • Treatment procedures.<br>• Medication management and other associated treatments.<br>• Individual, family and group therapy.<br>• Provider-based case management services.<br>• Crisis intervention. |
| | | The Mental Health/Substance-Related and Addictive Disorders Administrator provides administrative services for all levels of care. |
| | | … |
| | | Prior Authorization Requirement |

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

| | | Please remember for Non-Network Benefits for:<br><br>• A scheduled admission for Substance-Related and Addictive. Disorders Services (including Partial Hospitalization/Day Treatment and services at a Residential Treatment facility) you must obtain authorization prior to the admission<br><br>• A non-scheduled admission (including Emergency admissions) you must provide notification as soon as is reasonably possible.<br><br>• Intensive Outpatient. Treatment programs; outpatient electro-convulsive treatment; psychological testing; extended outpatient treatment visits beyond 45 - 50 minutes in duration, with or without medication management, medication assisted treatment programs for substance-related and addictive disorders, you must obtain prior authorization before services are received.<br><br>If you fail to obtain prior authorization from or provide notification to the Mental Health/Substance-Related and Addictive Disorders Administrator as required, you will be responsible for paying all charges and no Benefits will be paid." |
|---|---|---|
| Benefits OON Lab | p. 52 | "Additional Coverage<br><br>Lab, X-Ray and Diagnostics – Outpatient<br><br>Services for Sickness and Injury-related diagnostic purposes, received on an outpatient basis at a Hospital or Alternate Facility include, but are not limited to:<br><br>• lab and radiology/x-ray; and<br>• mammography (non-preventive).<br><br>Benefits under this section include:<br><br>• the facility charge and the charge for supplies and equipment; and<br>• Physician services for radiologists, anesthesiologists and pathologists. |

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

| | | | When these services are performed in a Physician's office, Benefits are described under Physician's Office Services - Sickness and Injury in this section.

Benefits for other Physician services are described in this section under Physician Fees for Surgical and Medical Services. Lab, X-ray and diagnostic services for preventive care are described under Preventive Care Services in this section. ...." |
| Definition – Covered Health Services | p. 135 | "Covered Health Services – those health services, including services, supplies or Pharmaceutical Products, which Samsung Austin Semiconductor, LLC determines to be:

• provided for the purpose of preventing, diagnosing or treating Sickness, Injury, Mental Illness, Substance Use Disorders, or their symptoms;
• consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines as described below;
• not provided for the convenience of the Covered Person, Physician, facility or any other person;
• included in Sections 5 and 6, Plan Highlights and Additional Coverage Details;
• provided to a Covered Person who meets the Plan's eligibility requirements, as described under Eligibility in Section 2, Introduction; and
• not identified in Section 8, Exclusions.

In applying the above definition, 'scientific evidence' and 'prevailing medical standards' have the following meanings:

• 'scientific evidence' means the results of controlled Clinical Trials or other studies published in peer-reviewed, medical literature generally recognized by the relevant medical specialty community; and
• 'prevailing medical standards and clinical guidelines' means nationally recognized professional standards of care including, but not limited to, |

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

| | | |
|---|---|---|
| | | national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines.<br><br>The Claims Administrator maintains clinical protocols that describe the scientific evidence, prevailing medical standards and clinical guidelines supporting its determinations regarding specific services. …" |
| Definition – Intensive Outpatient Treatment | p. 141 | "Intensive Outpatient Treatment – a structured outpatient Mental Health or substance related and addictive disorders treatment program that may be free-standing or Hospital based and provides services for at least three hours per day, two or more days per week." |
| Definition – Medically Necessary | p. 142 | "Medically Necessary – health care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as determined by the Claims Administrator or its designee, within the Claims Administrator's sole discretion.<br><br>• in accordance with Generally Accepted Standards of Medical Practice;<br>• clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders disease or its symptoms;<br>• not mainly for your convenience or that of your doctor or other health care provider; and<br>• not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.<br><br>Generally Accepted Standards of Medical Practice are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one |

CALLAHAN & BLAINE<br>A PROFESSIONAL LAW CORPORATION<br>3 HUTTON CENTRE DRIVE, NINTH FLOOR<br>SANTA ANA, CALIFORNIA 92707<br>TELEPHONE: (714) 241-4444<br>WWW.CALLAHAN-LAW.COM

| | | institution that suggest a causal relationship between the service or treatment and health outcomes. |
|---|---|---|
| | | If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. The Claims Administrator reserves the right to consult expert opinion in determining whether health care services are Medically Necessary. The decision to apply Physician specialty society recommendations, the choice of expert and the determination of when to use any such expert opinion, shall be within the Claims Administrator's sole discretion. |
| | | The Claims Administrator develops and maintains clinical policies that describe the Generally Accepted Standards of Medical Practice scientific evidence, prevailing medical standards and clinical guidelines supporting its determinations regarding specific services. …" |
| Definition – Partial Hospitalization/Day Treatment | p. 143 | "Partial Hospitalization/Day Treatment – a structured ambulatory program that may be a free-standing or Hospital-based program and that provides services for at least 20 hours per week." |
| Definition – Substance-Related and Addictive Disorders Services | p. 146 | "Substance-Related and Addictive Disorders Services - Covered Health Services for the diagnosis and treatment of alcoholism and substance-related and addictive disorders that are listed in the current Diagnostic and Statistical Manual of the American Psychiatric Association, unless those services are specifically excluded. The fact that a disorder is listed in the Diagnostic and Statistical Manual of the American Psychiatric Association does not mean that treatment of the disorder is a Covered Health Service." |
| Determination of Benefits | pp. 17-18 | "For Non-Network Benefits, Eligible Expenses are based on either of the following: … - Negotiated rates agreed to by the non-Network provider and either UnitedHealthcare or one of UnitedHealthcare's vendors, affiliates or subcontractors, at UnitedHealthcare's discretion. |

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

|  |  | - If rates have not been negotiated, then one of the following amounts:<br><br>    * Eligible Expenses are determined based on 140% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market, with the exception of the following:<br><br>    - 50% of CMS for the same or similar laboratory service.<br><br>    …<br><br>    * When a rate is not published by CMS for the service, UnitedHealthcare uses an available gap methodology to determine a rate for the service as follows:<br><br>- For services other than Pharmaceutical Products, UnitedHealth care uses a gap methodology established by OptumInsight and or a third party vendor that uses a relative value scale. … UnitedHealthcare and OptumInsight are related companies through common ownership by UnitedHealth Group. ….<br><br>- For Pharmaceutical Products, UnitedHealthcare uses gap methodologies that are similar to the pricing methodology used by CMS, and produce fees based on published acquisition costs or average wholesale price for the pharmaceuticals. These methodologies are currently created by RI Health Systems, Thomson Reuters (published in its Red Book), or UnitedHealthcare based on an internally developed pharmaceutical pricing resource.<br><br>- When a rate is not published by CMS for the service and a gap methodology does not apply to the service, the Eligible Expense is based on 50% of the provider's billed charge.<br><br>- For Mental Health Services and Substance-Related and Addictive Disorders Services the Eligible Expense will be reduced by 25% for Covered Health Services provided by a psychologist and by 35% for Covered Health Services provided by a masters level counselor. |

THIRD AMENDED CONSOLIDATED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

| | | |
|---|---|---|
| | | UnitedHealthcare updates the CMS published rate data on a regular basis when updated data from CMS becomes available. These updates are typically implemented within 30 to 90 days after CMS updates its data." |
| Benefit Reimbursement OON SUD | p. 34 | "Substance -Related and Addictive Disorders Services<br><br>• Inpatient<br><br>   [non-network] - 70% after you meet the $300 Deductible<br><br>• Outpatient<br><br>   [non-network] - 70% after you meet the $300 Deductible." |
| Benefit Reimbursement OON Lab | p. 29 | "Lab, X-Ray and Diagnostics –<br><br>• Outpatient<br><br>   [non-network] - 70% after you meet the $300 Deductible." |
| Out-of-Pocket Maximum | p. 19 | "Out-of-Pocket Maximum<br><br>The annual Out-of-Pocket Maximum is the most you pay each calendar year for Covered Health Services. There are separate Network and non-Network Out-of-Pocket Maximums for this Plan. If your eligible out-of-pocket expenses in a calendar year exceed the annual maximum, the Plan pays 100% of Eligible Expenses for Covered Health Services through the end of the calendar year.<br><br>The following table identifies what does and does not apply toward your Network and non-Network Out-of-Pocket Maximums:<br><br>Plan Features - Applies to the Non –Network Out-of-Pocket maximum?<br><br>   Copays: Yes<br><br>   Payments toward the Annual Deductible: Yes<br><br>   Coinsurance Payments: Yes<br><br>   Charges for non-Covered Health Services: No |

THIRD AMENDED CONSOLIDATED COMPLAINT

|  |  | The amounts of any reductions in Benefits you incur by not obtaining prior authorization: No<br><br>Charges that exceed Eligible Expenses: No." |
|---|---|---|
| Out-of-Pocket Maximum | p. 25 | "SECTION 5 - PLAN HIGHLIGHTS<br><br>Annual Deductible<br><br>• Individual – [non-network] $300<br>• Family (not to exceed $300 per Covered Person for Non-Network Benefits) – [non-network] $900<br><br>Annual Out-of-Pocket Maximum<br><br>• Individual – [non-network] $5,000<br>• Family (not to exceed $3,000 per Covered Person for Network Benefits and not to exceed $5,000 per Covered Person for Non-Network Benefits) – [non-network] $15,000." |

204.    Defendants, and each of them, insure, sponsor, fund, serve as the designated plan administrator and/or serve as the named plan administrator's designee for the various ERISA health plans at issue.

205.    The ERISA health plans at issue expressly state that United acts as plan fiduciary and administrator, with discretionary authority and discretionary control respecting management of the plan benefits, sole discretionary authority and responsibility to interpret and construe the provisions of the plans and to determine all factual and legal questions under the plans, and the right to delegate such discretionary authority.

206.    With respect to a percentage of the ERISA claims at issue, United delegated to MultiPlan its discretionary authority to determine the amount of benefits owed for medically necessary covered services, pursuant to a service agreement that incentivized MultiPlan to reduce the amount of benefits paid to Plaintiffs, using MultiPlan's pricing database of healthcare claims data that is wholly unrepresentative of amounts actually charged by or paid to similar medical

CALLAHAN & BLAINE<br>A PROFESSIONAL LAW CORPORATION<br>3 HUTTON CENTRE DRIVE, NINTH FLOOR<br>SANTA ANA, CALIFORNIA 92707<br>TELEPHONE: (714) 241-4444<br>WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

providers in Plaintiffs' surrounding area, generating unreasonably low payment amounts relative to the reimbursement amounts that would have been generated if United and MultiPlan instead had relied on the reimbursement methodologies set forth in the plans.

207.   Once MultiPlan's database and pricing tool generated a rate with respect to a particular claim at issue, MultiPlan returned the rate information to United, who then issued the under-payment of benefits to Plaintiffs.

208.   After United under-reimbursed Plaintiffs' claims that were priced by MultiPlan, Plaintiffs received explanations of benefits ("EOB") from United that are misleading because the EOBs do not explain that United's reimbursements had been based on a methodology inconsistent with the plans' requirements, and omitted information from these EOBs about the reimbursement methodology it used.  But what the EOBs did make clear was MultiPlan's role as a plan fiduciary in determining the amount of benefits United would pay under the plans.

> CY: THIS PAYMENT HAS BEEN REDUCED BY THE AMOUNT THAT IS ABOVE THE ELIGIBLE EXPENSE AMOUNT FOR OUT-OF-NETWORK SERVICES UNDER YOUR PLAN IN YOUR AREA.  IF YOU ARE BILLED FOR AN AMOUNT ABOVE THE ELIGIBLE AMOUNT, PLEASE CALL VIANT [MultiPlan] DIRECTLY AT 1-800-598-6888.

209.   The various ERISA health plans at issue fall into two categories – fully-funded and self-funded – but are administered the same.

210.   With respect to each ERISA plan at issue in this litigation that is a fully-funded plan, Defendants, and each of them are responsible for both administering and paying the claims from their own bank accounts, and are the plan administrators and ERISA fiduciaries for these plans.

211.   With respect to each ERISA plan at issue in this litigation that is a self-funded plan, Defendants, and each of them, administer these plans pursuant to an administrative service agreement, by which the self-funded ERISA plan sponsors delegated to Defendants, and each of them, the authority and responsibility for all

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

administrative responsibilities, including *inter alia,* providing plan members with plan documents, interpreting and applying the plan terms, making coverage and benefits decisions, handling appeals of coverage and benefits decisions, and providing for payment from their own bank accounts in the form of claim reimbursements, and as such are the plan administrators and ERISA fiduciaries for these plans.

212.   With respect to each ERISA plan at issue in this litigation that is a self-funded plan, but which does not specifically designate a plan administrator, Defendants, and each of them, functioned as the *de facto* plan administrators and were specifically designated by the ERISA plan sponsors as the claims administrator, with the same fiduciary duties as expressly designated plan administrators, and as such are the plan administrators and ERISA fiduciaries for these plans.

213.   With respect to each ERISA plan at issue in this litigation that is a self-funded plan, Defendants, and each of them, make all benefit determinations and authorize benefit checks to be issued out of their own bank accounts.  Periodically, Defendants, and each of them, will notify the ERISA self-funded plan sponsors of the need to replenish their accounts so that benefits can be paid.  Defendants, and each of them, control these accounts and are fully responsible for processing the insurance claims and making the determination whether to issue a benefits payment check from these accounts.

214.   As alleged herein, Defendants, and each of them, acted as agents for each other with regard to processing the claims under the ERISA plans at issue. With respect to the ERISA plans, whether fully-funded or self-funded, Defendants, and each of them, are the proper parties for Plaintiffs to sue because Defendants, and each of them, not the underlying plan sponsor or employer, made and continue to make all the relevant decisions whether to honor or deny claims under the ERISA plans, and exercised and continue to exercise the authority to issue benefit payment

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

1   checks under the ERISA plans form their own bank accounts.

2      215.   After providing covered treatment and services to those of the 1,304

3   insureds at issue with ERISA plans, Plaintiffs submitted their claims to Defendants

4   for payment in accordance with the procedures for receiving benefits under the

5   terms of the ERISA plans, with the claim forms notifying Defendants that Plaintiffs

6   were submitting the claims as the insureds' assignee.  Defendants were obligated –

7   under the law and the ERISA plans – to pay Plaintiffs the applicable plan percentage

8   of their covered charges (between 50% to 90% of covered charges, with the majority

9   of plans paying out-of-network benefits at 70% of covered charges (minus any

10  outstanding insured cost-sharing amounts)) until the insured's nominal annual out-

11  of-pocket maximum is met at which time Defendants pay 100%.

12     216.   Instead of paying Plaintiffs per the ERISA plan documents and the law,

13  Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and

14  systematic polices, practices and decisions – with an emphasis on profits over

15  patients – and paid Plaintiffs, as a group, an average of 19.15% of their covered

16  charges.  It was only after Plaintiffs rendered the treatment and services at issue that

17  Defendants refused to properly compensate Plaintiffs for the covered treatment and

18  services rendered to Defendants' insureds.

19     217.   Defendants never informed or advised Plaintiffs during the claims or

20  post-claims process of any anti-assignment ERISA plan terms, and Defendants have

21  thereby waived and are estopped from asserting any anti-assignment plan terms in

22  this action.  See fn. 3, supra.  Likewise, Defendants never provided Plaintiffs with

23  the ERISA plan documents, and Defendants, and each of them, made benefit

24  determinations that were not based on individual plan terms.  Similarly, Defendants

25  never provided Plaintiffs with notice of any administrative remedy provisions,

26  limitation of action provisions or any other conditions to coverage under the terms

27  of the plans.

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

218.   During the claim submission and payment process, Defendants put Plaintiffs on various pre-payment review and program integrity audits, and through their various departments, Defendants repeatedly requested the same documents and information from Plaintiffs, over and over again.   This was all an attempt by Defendants, and each of them, to avoid processing and paying the claims.   Plaintiffs complied with Defendants' repetitive requests and despite being released from the audits and promised payment pursuant to, *inter alia*, the ERISA plans and/or repricing agreements, Defendants refused to properly reimburse Plaintiffs for the covered treatment and services provided to Defendants' insureds.   Defendants likewise failed and refused to provide Plaintiffs and the insureds with adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims, and failed and refused to provide Plaintiffs and the insureds with a reasonable opportunity to engage in a meaningful claims process and procedure which was full and fair.   Defendants' audits, bogus TIN flags and pending of claims, inadequate notices and explanations, denial of full and fair claims processes and procedures, repetitive document and information requests and promises of payment were false and fraudulent and were implemented by Defendants, and each of them, as a pretext to illegally delay and deny Plaintiffs (and hundreds of other substance use disorder treatment providers and clinical laboratories) payment in accordance with the law and the ERISA plans.

219.   Plaintiffs have made all reasonable efforts to have Defendants adjudicate their claims, and have provided Defendants with thousands of pages of treatment records, none of which Defendants even consider for determining coverage.   Plaintiffs have exhausted, or by law are deemed to have exhausted, their administrative remedies under the ERISA plans at issue and, moreover, Defendants' pattern of misconduct and misbehavior as described herein rendered all potential and further administrative remedies futile.

220.   Not all of the ERISA plans at issue require the exhaustion of administrative remedies as a condition precedent to Plaintiffs taking legal action, and those having such conditions couch the material terms of the appeal and grievance process as an optional procedure, stating that if a claim for plan benefits is denied, the insured member or an authorized representative, such as the provider, *may* participate in Defendants' appeals and grievance process.

221.   Out of network providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, have standing to pursue ERISA claims against Defendants, and their assigned right to reimbursement includes the ability to seek judicial enforcement of that right in this action.

222.   ERISA notice and appeal rights belong to the party with the legal right to payment,[19] and the Department of Labor ("DOL") maintains that providers who have been assigned their patients' rights to reimbursement, such as Plaintiffs, are entitled to insist upon their assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the ERISA Claims Regulation.[20]

223.   For the denials and underpayment of benefits at issue in this action, Defendants provided two different EOBs.  The EOBs provided to the patient insureds include the following language:

> A review of this benefit determination may be requested by submitting your appeal to us ….
>
> The request for your review must be made within 180 days from the date you receive this statement.

---

[19] *See Premier Health Ctr. v. UnitedHealth Grp.*, 292 F.R.D. 204, 221 (D.N.J. 2013) (Out of network providers who have been assigned their patients' rights to reimbursement have standing to pursue ERISA claims against United, and that "assignment of the right to reimbursement 'must logically include the ability to seek judicial enforcement of that right.'" *Id.*, citation omitted.

[20] *See Tri3 Enters., LLC v. Aetna, Inc.*, 2012 WL 6113799, at *29 (3d Cir. Nov. 30, 2012) (DOL Amicus Brief) (Out of network providers who have been assigned their patients' rights to reimbursement are "entitled to insist upon [their] assigned right to challenge the allegedly wrongful decision to deny benefits through a process that complies with the [ERISA] claims regulation."

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

> If your plan is governed by ERISA you may the right to file a civil action under ERISA if all required reviews of your claim have been completed.
>
> You or your authorized representative, such as a family member or physician, may appeal the decision by submitting comments documents or other relevant information ….

224.   Conversely, the majority of EOBs provided to the patient's providers, including Plaintiffs, contain no notice of appeal rights or mention of the requirement to exhaust an appeal process.  For the few provider EOBs that do make reference to an appeal process, the language fails to satisfy the requirements of the ERISA Claim Regulations.

> The member, provider, or an authorized representative may request reconsideration or appeal the decision by submitting comments, documents or other information to UnitedHealthcare.

225.   Defendants failed to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation (29 C.F.R. § 2560.503-1), which is consistent with Defendants' custom and practice of only giving notice of ERISA appeal rights—if they give notice at all—to parties least likely to exercise them (patients who have assigned their right to payment to providers), and deny those rights to parties most likely to exercise them (providers who have been assigned the right to payment).  Defendants' failure to provide Plaintiffs with proper notice of their appeal rights pursuant to ERISA Claims Regulation is a systematic violation of ERISA, deeming the administrative remedies exhausted,[21] constituting a waiver of any condition requiring exhaustion of administrative remedies under the ERISA plans at issue, and estopping Defendants from asserting administrative

---

[21] 29 C.F.R. § 2560.503–1(*l*); *see Barboza v. California Ass'n of Professional Firefighters* (9th Cir. 2011) 651 F.3d 1073, 1076 ("when an employee benefits plan fails to establish or follow 'reasonable claims procedures' consistent with the requirements of ERISA, a claimant need not exhaust because his claims will be deemed exhausted"); *see also Downey Surgical Clinic, Inc. v. Ingenix, Inc.* (C.D. Cal., May 30, 2014, No. CV 09-5457 PSG (CTX)) 2014 WL 12558848, at *5–6.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    exhaustion as a defense.

2        226.   Even when these similarly situated Plaintiffs sought to enforce their

3    assigned appeal rights in response to Defendants' wrongful denials and

4    underpayment of plan benefits for similarly situated patients, by giving notice in

5    accordance with the ERISA plans offering an appeal and grievance procedure, and

6    supplying the requisite information and documents, Plaintiffs exhausted the

7    administrative remedies to no avail.  Defendants repeatedly requested more and

8    more records (even duplicate requests), conducted sham peer to peer reviews and

9    ultimately upheld their denials and underpayments, representing to Plaintiffs that

10   Defendants' decision was final and "no further steps needed to be taken," and not

11   advising Plaintiffs of any further conditions on Plaintiffs' rights to litigate the

12   ERISA claims at issue.  All of these facts and circumstances, along with

13   Defendants' insistence that it owes not a penny of the more than $140 million in

14   benefits at issue in this consolidated action, render it reasonable for Plaintiffs to

15   conclude that the pursuit of an administrative appeal to Defendants would be

16   futile.[22]

17       227.   Defendants, and each of them, have failed to process Plaintiffs' claims

18   in a manner consistent with ERISA, by, among other acts and omissions:

19            a.      Delaying the processing, adjustment and/or payment of claims

20   for periods of time greater than 45 days after submission of the claims in violation

21   of 29 C.F.R. §2560.503-1(f)(2)(iii)(B);

22

23

_____

24   [22] *See In re WellPoint, Inc. Out-of-Network UCR Rates Litigation,* 865 F.Supp.2d 1002, 1041–
     1042 (C.D. Cal. 2011) (providers demonstrated futility by pointing to similarly situated plaintiffs
25   who exhausted administrative remedies to no avail; *see also Perkins v. Prudential Insurance
     Company of America,* 417 F.Supp.2d 1149, 1153 (C.D. Cal. 2006) (plaintiff's showing
26   of futility sufficient where the long history of claims and lawsuits between the plaintiff and the
     insurer showed that the insurer "consistently refused to pay [the plaintiff's] benefits until
27   sued."); *see also Melczer v. Unum Life Ins. Co. Am.,* 2009 WL 792502 (D. Ariz. March 24, 2009)
     (futility adequately shown where there was evidence regarding the lack of reviews done by the
28   insurer in initial determination of claim such that appeal would be futile).

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

b.      Failing and refusing to provide any notice and/or explanation for the denial of benefits, payments or reimbursement of the claims of each of the insureds, in violation of 29 U.S.C. §1133(1);

c.      Failing and refusing to provide an adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims of each of the insureds, in violation of 29 U.S.C. § 1133(1);

d.      Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, and by failing and refusing to set forth the specific reasons for such denials, all in violation of 29 U.S.C. §1133(1);

e.      Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the insureds, written in a manner calculated to be understood by the participant, in violation of 29 U.S.C. § 1133(1);

f.      Failing to afford Plaintiffs and/or their patient insureds with a reasonable opportunity to engage in an appeals process, in violation of 29 U.S.C. §1133(2);

g.      Failing to afford Plaintiffs and/or their patient insureds with a reasonable opportunity to engage in meaningful appeal process which was full and fair, in violation of 29 U.S.C. §1133(2);

h.      Failing and refusing to provide Plaintiffs and/or their patient insureds with information pertaining to their rights to appeal, including not limited to those deadlines for filing appeals and/or the requirements that an appeal be filed, in violation of 29 U.S.C. §1133(1);

i.      Violating the minimum requirements for employee benefit plans pertaining to claims and benefits by participants and beneficiaries, in violation of 29 C.F.R. § 2560.503-1(a), *et seq.*;

j.      Failing and refusing to establish and maintain reasonable claims procedures in violation of 29 C.F.R. § 2560.503-1(b);

k.      Establishing, maintaining and enforcing claims procedures which unduly inhibit the initiation and processing of claims for benefits, in violation of 29 C.F.R. §2560.503.1(b)(3);

l.      Precluding and prohibiting Plaintiffs from acting as authorized representatives of the patient insureds in pursuing a benefit claim or appeal of an adverse benefit determination, in violation of 29 C.F.R. §2560.503-1(b)(4);

m.      Failing and refusing to design, administer and enforce their processes, procedures and claims administration to ensure that their governing plan documents and provisions have been applied consistently with respect to similarly situated participants, beneficiaries and claimants, in violation of 29 C.F.R. §2560.503-1(b)(5);

n.      Failing and refusing to pay benefits for services rendered by Plaintiffs which Defendants authorized, as well as rescinding the same, in violation of California Health & Safety Code §1371.8 and California Insurance Code §796.04;

o.      Failing to offer coverage for mental health and substance use disorder treatment and related laboratory services in parity with the medical and surgical benefits afforded by the same plans, as required by 26 U.S.C. §9812(3), as well as other mandates set forth at 26 U.S.C. §9812, *et seq.*; and

p.      Failing and refusing to pay Plaintiffs for the substance use disorder treatments and related laboratory services provided to the patient insureds in violation of 26 U.S.C. § 9812(3).

228.   Defendants' failure and refusal to provide coverage, reimbursement, payment and/or benefits for the substance use disorder treatment and laboratory services that Plaintiffs rendered to Defendants' insureds/members and Defendants' denial of health insurance benefits coverage constitute breaches of the ERISA plans

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

at issue.  Plaintiffs seek reimbursement and compensation for any and all payments which they would have received and to which they are entitled to as a result of Defendants' breaches and failure to pay benefits and cover the treatments and services rendered by Plaintiffs to Defendants' insureds/members, in amounts according to proof at trial.

229.   Defendants have arbitrarily and capriciously breached the obligations set forth in the ERISA plans at issue, and Defendants have arbitrarily and capriciously breached their obligations under the ERISA plans to provide Plaintiffs and the patient insureds with health benefits.

230.   To remedy Defendants' wrongful conduct, Plaintiffs seek an order awarding them an amount equal to the amount of benefits Plaintiffs should have received and to which the patient insureds would have been entitled had Defendants paid the proper amounts, in amounts according to proof at trial, as direct and proximate result of the denial of plan benefits and other wrongful conduct by Defendants, and each of them, as alleged herein.

231.   Plaintiffs are entitled to an award of reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g)(1).  As a result of the actions and failings of Defendants, and each of them, Plaintiffs have retained the services of legal counsel and have necessarily incurred attorney's fees and costs in prosecuting this litigation. Furthermore, Plaintiffs anticipate incurring additional attorney's fees and costs hereafter pursing this litigation and recovery of amounts due and owed by Defendants.

## SECOND CAUSE OF ACTION

### Breach of Written Contract

### (Non-ERISA Plans)

### Against All Defendants

232.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

233.   Plaintiffs allege this cause of action in connection with their claims for substance use disorder treatment and laboratory services rendered to those of Defendants' 1,304 insureds with health insurance plans not governed by ERISA. Plaintiffs bring this cause of action as assignees and third party beneficiaries of the non-ERISA health insurance plans at issue.

**Assignees**

234.   Plaintiffs are out-of-network substance use disorder treatment providers and clinical laboratories.  Plaintiffs are in the profession of helping individuals recover from alcoholism and addiction and return to their families and communities as productive and contributing members of society.  Plaintiffs provided medically necessary, verified, preauthorized and covered substance use disorder treatment and laboratory services to 1,304 individuals with health insurance that was sold, insured, managed and/or administered by Defendants, including the non-ERISA health plans. The treatment and services provided by Plaintiffs include RTC, PHP, IOP, OP, treatment planning, counseling and behavioral therapies, individual, family and group therapy, medication management, case management services, and laboratory services to, among other things, determine, measure, or otherwise describe the presence or absence of various substances in the body.

235.   Defendants' health insurance plans, for each of the 1,304 insureds at issue, including the non-ERISA health plans, provide coverage for out-of-network substance use disorder treatment and laboratory services.  In this regard, the plans, and each of them, provide that out-of-network substance use disorder benefits include the following levels of care: RTC, PHP, IOP, and OP.  The plans also provide that out-of-network covered substance use disorder services include: diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, and crisis intervention.  The plans further provide coverage

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

for out-of-network laboratory benefits, which include the facility charge and the charge for supplies and equipment, physician services for pathologists, and presumptive drug tests and definitive drug tests.

236.   Defendants' health insurance plans, for each of the 1,304 insureds at issue, including the non-ERISA health plans, pay benefits for out-of-network substance use disorder treatment and laboratory services, including, but not limited to, RTC, PHP, IOP, OP, diagnostic evaluations, assessment and treatment planning, treatment and/or procedures, medication management and other associated treatment, psychological testing, referral services, individual, family and group therapy, provider-based case management services, crisis intervention, and laboratory services, at varying percentages of covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts, which Defendants deduct from payments to Plaintiffs)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%. Plaintiffs are informed and believe, and based thereon allege, that each of the 1,304 insureds had already met their annual out-of-pocket maximum at the time they first received treatment or services from Plaintiffs, or shortly thereafter.  The plans also pay 100% of covered charges in the event of a "network inadequacy" or "network gap" for the services received.  Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein Defendants had an inadequate network of substance use disorder treatment providers and clinical laboratories.  The exclusions, conditions and limitations in the plans do not apply to the treatments and services provided by Plaintiffs.

237.   Plaintiffs obtained oral and written assignments of benefits from each of the 1,304 insureds at issue, by which Defendants' insureds intended to, and did, assign to Plaintiffs not only his/her rights to payment of claims but to assert all rights and causes of action against Defendants in connection with such claims.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

Moreover, Defendants confirmed, represented, promised and warranted to Plaintiffs through the required verification of benefits and the preauthorization process, that each of the insureds and his/her respective out-of-network treatments and services were covered by health insurance plans issued, managed and/or administered by Defendants and that Plaintiffs would be properly paid for treating Defendants' insureds.  At all times relevant herein, Defendants knew that Plaintiffs were treating and providing services, and would continue to treat and provide services, to their insureds, and Defendants were, at all times, fully aware of Plaintiffs' charges for the treatment and services rendered.

238.   After providing covered treatment and services to the 1,304 insureds at issue, Plaintiffs submitted their claims to Defendants for payment.  Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Plaintiffs per the plan documents and the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over patients – and paid Plaintiffs, as a group, an average of 19.15% of their covered charges.

239.   Plaintiffs have performed all, or substantially all, of the significant things required of them under the health insurance plans, except as excused by Defendants' material breaches.

240.   Defendants, and each of them, breached the health insurance plans by the conduct alleged herein, including without limitation withholding of proper claim payments from Plaintiffs, making unreasonable demands on Plaintiffs, not engaging in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when,

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   in fact, coverage exists and benefits are owed to Plaintiffs.

2   241.    As a direct and proximate result Defendants' breaches, Plaintiffs have

3   suffered and will continue to suffer in the future, economic loss, including the

4   benefits owed under the health insurance plans and the law in the millions, the

5   interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and

6   other general, incidental and consequential damages, in amounts according to proof

7   at trial.  Plaintiffs are also entitled to recover statutory and prejudgment interest

8   against Defendants, and each of them.

9   **Third Party Beneficiaries**

10   242.   Plaintiffs are also express and intended third-party beneficiaries of the

11   health insurance plans between Defendants and the 1,304 insured patients treated by

12   Plaintiffs, and are entitled to recover on that basis.

13   243.   Defendants and their insureds intended that Plaintiffs directly benefit

14   from the health insurance plans and the plans indicate the intent to benefit Plaintiffs

15   by payment for the services provided to Defendants' insureds.

16   244.   The health insurance plans issued, managed and/or administered by

17   Defendants provide their insureds with the option of seeking treatment with

18   Defendants' INPs or choosing their own ONPs, like Plaintiffs.  The plans also

19   provide for the payment of benefits for ONPs, like Plaintiffs, who provide medically

20   necessary services to the insureds.  Although the plans issued, managed and/or

21   administered by Defendants may incentivize their insureds to seek treatment with

22   INPs, the plans explicitly express Defendants' intent to benefit ONPs, like Plaintiffs.

23   245.   The health insurance plans issued, managed and/or administered by

24   Defendants further express Defendants' intent to benefit ONPs, like Plaintiffs,

25   insofar as the plans expressly incorporate by reference regulations requiring

26   insurers, like Defendants, to provide an adequate network of INPs and, in the event

27   of a "network inadequacy" or "network gap," requiring insurers, like Defendants, to

28   pay for the required care with available and accessible ONPs, like Plaintiffs,  with

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT

the insureds responsible for paying only cost-sharing in an amount equal to the cost-sharing they would have paid for provision of that or a similar service by an INP.

246.   Defendants' intent to benefit ONPs, like Plaintiffs, by the terms of the health insurance plans at issue is further evidenced by the conduct of the Defendants, who issued payments to ONPs, including Plaintiffs, for the medically necessary services rendered to their insureds, in accordance with the terms of the plans, until in or around 2015, when the Defendants, as part of their scheme to decrease their costs on mental health and substance use disorder treatment claims, conspired, concocted and implemented their plans to significantly decrease, and in some cases completely ceased reimbursing, ONPs providing substance use disorder treatment and related services, including Plaintiffs.

247.   As set forth hereinabove, Plaintiffs provided covered, verified, preauthorized and medically necessary substance use disorder treatment and laboratory services to Defendants' insureds, all 1,304 of them, at great expense to Plaintiffs.  After providing the services, Plaintiffs submitted their claims to Defendants for payment, requesting compensation for the treatment and services provided to the insureds.

248.   Plaintiffs have performed all, or substantially all, of the significant things required of them under the health insurance plans, except as excused by Defendants' material breaches.

249.   Defendants were obligated – under the law and the plans – to pay Plaintiffs the applicable plan percentage of their covered charges (between 50% to 90% of covered charges, with the majority of plans paying out-of-network benefits at 70% of covered charges (minus any outstanding insured cost-sharing amounts)) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.  Instead of paying Plaintiffs per the plan documents and the law, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic polices, practices and decisions – with an emphasis on profits over

THIRD AMENDED CONSOLIDATED COMPLAINT

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

patients – and paid Plaintiffs, as a group, an average of 19.15% of their covered charges.

250.   Defendants, and each of them, breached the health insurance plans by the conduct alleged herein, including without limitation withholding of proper claim payments from Plaintiffs, making unreasonable demands on Plaintiffs, not engaging in a prompt, full and complete investigation of Plaintiffs' claims, and interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact, coverage exists and benefits are owed to Plaintiffs.

251.   As a direct and proximate result Defendants' breaches, Plaintiffs have suffered and will continue to suffer in the future, economic losses, including the benefits owed under the health insurance plans in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial. Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

### THIRD CAUSE OF ACTION

#### Breach of Implied Covenant of Good Faith and Fair Dealing

#### Against All Defendants

252.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

253.   Plaintiffs allege this cause of action in connection with their claims for substance use disorder treatment and laboratory services rendered to the 1,304 insureds with health insurance plans not governed by ERISA.

254.   As alleged herein, Plaintiffs are assignees and intended beneficiaries of their patients' health insurance plans issued, managed and/or administered by Defendants and the rights conferred thereunder.

255.   Each health insurance plan contains an implied covenant of good faith and fair dealing that obligates each party to do nothing to injure the right of the other

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

party to receive the benefits of the agreement.

256.   As set forth herein, Plaintiffs provided covered, verified, preauthorized and medically necessary substance use disorder treatment and laboratory services to Defendants' insureds with the understanding and expectation that Defendants would act in good faith and deal fairly with Plaintiffs pursuant to the plans.  Defendants and each of them, however, tortiously breached the plans and the implied covenant of good faith and fair dealing, and committed unfair and deceptive acts and practices in direct violation of California's Unfair Insurance Practices Act (Cal. Ins. Code § 790 *et seq.*) and Fair Claims Settlement Practices Regulations (Cal. Code Regs. tit. 10, § 2695.1, *et seq.*) in the following ways, among others:

a.      Misrepresenting to Plaintiffs pertinent facts and insurance policy provisions relating to the coverages at issue (Cal. Ins. Code § 790.03(h)(1));

b.      Failing and refusing to acknowledge and act reasonably promptly upon Plaintiffs' communications with respect to the claims at issue (Cal. Ins. Code § 790.03(h)(2));

c.      Failing and refusing to adopt and implement reasonable standards for the prompt investigation and processing of the claims at issue (Cal. Ins. Code § 790.03(h)(3));

d.      Failing and refusing to affirm or deny coverage of the claims at issue within a reasonable time after proof of Plaintiffs' entitlement to benefits had been established (Cal. Ins. Code § 790.03(h)(4));

e.      Not attempting in good faith to effectuate prompt, fair, and equitable settlements of the claims at issue despite proof of Plaintiffs' entitlement to benefits having been established (Cal. Ins. Code § 790.03(h)(5));

f.      Compelling Plaintiffs to institute litigation to recover amounts due on the claims at issue by offering substantially less than the amounts owed (Cal. Ins. Code § 790.03(h)(6));

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

g.      Delaying the investigation and payment of the claims at issue by requiring Plaintiffs to submit multiple reports and documents that contain substantially the same information (Cal. Ins. Code § 790.03(h)(11));

h.      Failing to and refusing promptly settle the claims at issue despite proof of Plaintiffs' entitlement to benefits having been established under one portion of the insurance policy's coverage in order to influence settlements under other portions of the insurance policy's coverage (Cal. Ins. Code § 790.03(h)(12));

i.      Failing to and refusing promptly provide a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of the claims at issue or for the offer of a compromised amount on the benefits owed (Cal. Ins. Code § 790.03(h)(13));

j.      Discriminating in its claims settlement practices based upon the physical disabilities of Plaintiffs' patients/Defendants' insureds (Cal. Code Regs. tit. 10, § 2695.7(a));

k.      Failing and refusing to conduct and diligently pursue a thorough, fair and objective investigation and persisting in seeking information not reasonably required for or material to the resolution of the claims at issue (Cal. Code Regs. tit. 10, § 2695.7(d));

l.      Unjustifiably seeking reimbursement of an overpayment and withholding benefits payable as a result of a claim on the basis that the sum withheld or reimbursement sought is an adjustment or correction for an overpayment (Cal. Code Regs. tit. 10, § 2695.11(a));

m.      Failing and refusing to provide Plaintiffs with an explanation of benefits that includes a clear explanation of the computation of benefits (Cal. Code Regs. tit. 10, § 2695.11(b));

n.      Failing and refusing to affirm or deny contested claims within 30 calendar days from the original notification that the claims at issue were being contested (Cal. Code Regs. tit. 10, § 2695.11(d));

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

o.    Adopting unreasonable medical necessity standards that indiscriminately reduce the amount of authorized substance use disorder treatment available to their insureds;

p.    Bullying Plaintiffs into adopting these unreasonable standards by threatening to withhold righteous claim payments;

q.    Interpreting the plans in an unduly restrictive manner so as to deny coverage and benefits when, in fact, coverage exists and benefits are owed to Plaintiffs;

r.    Making unreasonable demands on Plaintiffs;

s.    Not engaging in a prompt, full and complete investigation of Plaintiffs' claims;

t.    Fraudulently representing to Plaintiffs that Defendants would pay the claims in accordance with the plans and the Viant and Multiplan contracts;

u.    Forcing Plaintiffs to file appeals and requests for external peer reviews to obtain authorization for medically necessary treatment, and to obtain proper medically necessity determinations for post-service claim reimbursements;

v.    Failing and refusing to pay benefits for services rendered by Plaintiffs that Defendants authorized, as well as rescinding the same (Cal. Health & Safety Code §1371.8; Cal. Ins. Code §796.04);

w.    Failing and refusing to offer coverage for mental health and substance use disorder treatment and related laboratory services in parity with the medical and surgical benefits afforded by the same plans (26 U.S.C. §9812, *et seq.*); and

x.    Failing to abide by the rules and regulations promulgated by the CDI and the DMHC as alleged herein, and by other acts and omissions of which Plaintiffs are presently unaware and which will be shown according to proof at the time of trial.

257.   In committing these unfair and deceptive acts and practices in direct

violation of California's Unfair Insurance Practices Act and Fair Claims Settlement Practices Regulations, Defendants and each of them not only breached their express contractual covenants to properly reimburse medically necessary covered claims, but also tortiously breached the implied covenant of good faith and fair dealing, frustrating the purpose of the insurance contracts by denying and underpaying benefits without any justification, unreasonably delaying adjudication of Plaintiffs' claims in an oppressive effort to force Plaintiffs to accept less than what they are owed under the plans, and leaving Plaintiffs without any notice of a right to appeal Defendants' adverse benefit determinations and forcing Plaintiffs incur the unreasonable expense of attorney fees and litigation costs to pursue the wrongfully denied and withheld benefits, which fees and costs are not recoverable under the insurance contract but which were proximately caused by Defendants' tortious conduct.

258.    Upon information and belief, the conduct of Defendants, and each of them, as alleged herein constitutes part of an institutional illegal pattern and practice of bad faith and unlawful insurance practices.

259.    Defendants' conduct constitutes a continuing tort that is causing Plaintiffs continued damages.

260.    The conduct of Defendants, and each of them, as alleged herein was undertaken by Defendants' officers, directors or managing agents who were responsible for supervision, operation, reports, communication and decisions.  The conduct of said officers, directors and managing agents, and of other employees, representatives and agents, was undertaken on behalf of Defendants, which had advance knowledge of the action and conduct of said individuals whose conduct and actions were authorized, ratified and approved by officers, directors or managing agents of Defendants.

261.    As a direct and proximate result Defendants' breaches, Plaintiffs have suffered and will continue to suffer in the future, economic losses, including the

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

benefits owed under the health insurance plans in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits, and other general, incidental and consequential damages, in amounts according to proof at trial. Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

262.   As a direct and proximate result of Defendants' breaches, Plaintiffs have incurred attorney's fees and costs as a result of efforts to secure the insurance benefits owed, in an amount according to proof.  Plaintiffs are also entitled to recover statutory and prejudgment interest against Defendants, and each of them.

## FOURTH CAUSE OF ACTION

### Breach of Oral Contract

### Against All Defendants

263.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

264.   As part of verifying benefits and authorizing treatment when necessary, and in multiple communications following admissions and the submission of claims, Defendants, and each of them, orally promised to pay Plaintiffs for the treatment and services provided to Defendants' insureds on the same terms as provided for in the plans between Defendants and their insureds; specifically, payments to Plaintiffs equal to a percentage of their covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

265.   The persons answering calls and corresponding on behalf of Defendants, and each of them, were upon information and belief the agents and employees of Defendants, and each of them, and in doing the things herein alleged were acting within the course and scope of such agency and employment and with the permission and consent of Defendants, and each of them.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

266.   Plaintiffs have performed all duties required of them under the oral contracts, except as excused by Defendants' material breaches.

267.   Defendants and each of them, however, breached the oral contracts by the conduct alleged herein, including without limitation the withholding of proper claim payments.

268.   As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered general and incidental damages according to proof, and are entitled to statutory and prejudgment interest and attorney's fees against Defendants.  Under this cause of action, Plaintiffs seek to recover the benefits orally promised, which are equal to a percentage of their covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

269.   As a direct and proximate result of Defendants' breaches, Plaintiffs have incurred and continue to incur economic loss, including the benefits owed in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, all according to proof.

## FIFTH CAUSE OF ACTION

### Promissory Estoppel

### Against All Defendants

270.   Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

271.   As part of verifying benefits and authorizing treatment when necessary, and in multiple communications following admissions and the submission of claims, Defendants expressed a clear promise to pay Plaintiffs on the same terms as provided for in the plans between Defendants and their insureds; specifically, payments to Plaintiffs equal to a percentage of their covered charges (between 50% to 90% of covered charges, with the majority of claims promised by Defendants to

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

be paid at 70% of covered charges) until the insured's nominal annual out-of-pocket maximum is met at which time Defendants pay 100%.

272. The persons answering calls and corresponding on behalf of Defendants, and each of them, were upon information and belief the agents and employees of Defendants, and each of them, and in doing the things herein alleged were acting within the course and scope of such agency and employment and with the permission and consent of Defendants, and each of them.

273. Plaintiffs relied on Defendants' promises in providing treatment and services to Defendants' insureds, and Defendants, and each of them, should reasonably have expected to induce Plaintiffs' action in providing treatment and services.

274. Plaintiffs have suffered substantial detriment in reliance upon Defendants' promises in providing treatment to Defendants' insureds, including without limitation the benefits owed in the millions, the interruption in Plaintiffs' businesses, lost business opportunities, lost profits and other consequences, all according to proof.

275. As a direct and proximate result of Defendants' breach of their promises, Plaintiffs are also entitled to statutory and prejudgment interest and attorney's fees against Defendants.

## SIXTH CAUSE OF ACTION

**Unfair Competition**

**Only Against Defendants UnitedHealth Group, Inc.,**

**United HealthCare Services, Inc., United HealthCare Insurance Company,**

**UHC of California, United HealthCare Services LLC,**

**United Behavioral Health, Inc., United Medical Resources, Inc.,**

**OptumInsight, Inc., Optum Services, Inc., Optum, Inc.**

276. Plaintiffs incorporate by reference all allegations set forth in each of the paragraphs above as if fully set forth herein.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

277.   The conduct of Defendants, and each of them, as alleged herein not only constitutes common law bad faith, but also violates state and federal law, regulations and policies, and thus constitutes unlawful, unfair, and fraudulent business practices in violation of the UCL (Bus. & Prof. Code §§ 17200 *et seq*.).

278.   Plaintiffs have suffered injury in fact and have lost money as a result of the unlawful conduct of Defendants, and each of them, as alleged herein, including but not limited to Defendants' wrongful denials and underpayment of claims inconsistent with the plan terms; refusal to honor the patients' valid assignments of rights for Plaintiffs to pursue their legal right to the health plan benefits; refusal to give Plaintiffs notice of their right to appeal the unreasonable adverse benefit determinations and then contending Plaintiffs have no legal right to the benefits owed for not exhausting the concealed administrative appeal process; delaying interminably the adjudication of claims with pretext audits and demands for documents, information and sham peer to peer reviews; and refusing to pay even those claims determined to be covered and owing because of cross-plan offsetting for alleged overpayment of prior claims.  All of this conduct was unlawful and designed specifically to deprive Plaintiffs and all other similarly situated out of network substance use disorder providers of their legal entitlement to reimbursement for medically necessary covered services rendered to Defendants' insureds.

279.   The wrongful conduct of Defendants and each of them has proximately caused direct injury to Plaintiffs and all other similarly situated out of network substance use disorder providers in the form of lost revenue necessary to keep their businesses in operation.  Defendants maintain an institutional pattern and practice of denying and underpaying out of network substance use disorder through the course of unlawful conduct alleged herein, with the intent of reducing the amount of benefits paid for such essential health care services that the PPACA mandates they cover.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

280.   As courts have held that a patient who has assigned his rights to his provider has no standing to challenge Defendants' practice of impermissibly requiring prior authorization for certain levels of care in order to wrongfully deny coverage; to challenge Defendants impermissible refusal to pay for covered and medically necessary claims for benefits; to challenge Defendants' practice of unlawfully demanding refunds or refusing to cover and pay for covered claims for individuals under one plan based on purported overpayments to other individuals covered by other plans; to challenge Defendants' refusal to cover and pay for covered counseling and behavioral therapy, case and treatment management services, pharmacologic management services, and breathalyzer testing; to challenge Defendants' refusal to cover and pay for covered clinical laboratory claims based upon arbitrary numerical limitations; or to challenge Defendants' systematic and willful underpayment of claims, including the substitution of an improper Medicare rate payment methodology for substance use disorder treatment claims, notwithstanding the increased out of pocket expense that results for the insured patient,[23] Plaintiffs and all other similarly situated out of network substance use disorder providers are the aggrieved parties who must hold Defendants accountable for their unfair and unlawful conduct.

281.   Plaintiffs are entitled to injunctive relief under the UCL and, as such, Plaintiffs seek a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, from unjustifiably withholding proper payment of claims.

282.   Plaintiffs are further entitled to an order appointing a receiver over Defendants, and each of them, and restoring to Plaintiffs any money or property that was acquired through the foregoing acts of unfair competition (Cal. Bus. & Prof. Code § 17203).

---

[23] *See Ryan S. v. UnitedHealth Grp., Inc., et al.,* 2020 WL 8028609, at *4–6 (C.D. Cal. Dec. 3, 2020).

## **PRAYER**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, and that the Court award the following relief:

1.  For compensatory, general and special damages in amounts to be proven at trial;

2.  For statutory and prejudgment interest;

3.  For costs incurred in connection with this lawsuit;

4.  For attorney's fees;

5.  For injunctive and equitable relief; and

6.  For all other relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a trial by jury for all claims triable by jury.

Dated:  January 18, 2021          **CALLAHAN & BLAINE, APLC**


                                 By:  /s/ *Damon D. Eisenbrey*
                                      Damon D. Eisenbrey
                                      Attorneys for Plaintiffs

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

THIRD AMENDED CONSOLIDATED COMPLAINT